**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Laura J. KRIHO, Defendant–Appellant.**

**No. 97CA0700.**

Colorado Court of Appeals, Div. I.

April 29, 1999.

Rehearing Denied Sept. 2, 1999.*

Certiorari Denied March 20, 2000.**

* KAPELKE, J., would grant.

** Justice HOBBS does not participate.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Roger G. Billotte, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Paul Grant, Parker, Colorado, for Defendant–Appellant.

Miller, Lane, Killmer & Greisen, David A. Lane, Denver, Colorado for Amicus Curiae American Civil Liberties Union.

H. Patrick Furman, Boulder, Colorado, for Amicus Curiae Colorado Criminal Defense Bar.

Opinion by Judge ROTHENBERG.

Defendant, Laura J. Kriho, appeals the order entered by the trial court finding her in contempt. We reverse and remand for a new trial.

This case arose from a May 1996 criminal proceeding in which Kriho served as one of twelve jurors in a trial concerning charges of unlawful possession of a schedule II controlled substance (methamphetamine), criminal impersonation, and unlawful possession of drug paraphernalia (underlying case).

During voir dire in the underlying case, the trial court spoke to the prospective jurors as a group, informed them of the charges and of court procedure, and administered an oath in which the jurors swore or affirmed "to answer truthfully the questions asked ... by the court or the attorneys concerning [their]

competency to sit as [jurors]" in the case. The court advised jurors that if they thought they would have problems following the law or any bias against either the defendant or the prosecution, they should bring it to the court's attention.

The court also conducted the following colloquy with the entire panel of prospective jurors:

Would all of you agree to follow my instructions on the law even if you don't agree with them or you don't think that they are what the law is or should be?

. . . .

What I need from you is a commitment that you will follow my instructions even if you don't agree with them. And you all agree to do that? Follow the instructions on the law? My job is to tell you what the law is, and will you all agree to follow my instructions? Will you all agree? Anyone saying no?

The panel members were not seated in the jury box at the time, but were in the gallery. No one gave an individual answer to these questions by the court.

In the next phase of voir dire, certain of the jurors were called into the jury box and questioned. Kriho sat with the unselected members of the venire in the courtroom gallery while approximately 350 questions were asked of those persons in the box.

There were individual discussions by the court and counsel with a number of prospective jurors about their obligation to follow the law given by the court, their attitudes regarding drug laws and alleged violations of drug laws, and their abilities to serve fairly and impartially. There was also discussion about issues surrounding drug-law enforcement, and instruction that they were not to consider punishment.

During the individual questioning of other prospective jurors, the court asked these questions among others:

Have any of you ever been a party to or a witness in a court trial?

. . . .

Has anybody in the panel been accused of a crime other than traffic stuff? Had to go to court for something?

Later, the prosecutor asked the jurors in the jury box this question:

[D]oes anyone have any particular strong feelings, either pro or con, about the laws we have including the law that will apply here that you will get from his Honor . . . about the control of dangerous drugs or controlled substances? In other words, it is against the law to possess methamphetamine and that is why we're here. Does anybody have any particular views about these laws including specifically this one?

The prosecutor also asked the prospective jurors in the jury box whether they had had "[a]ny experience with the justice system? Positive or negative?"

Eventually Kriho was called to the jury box as a replacement juror, and a relatively brief period of questioning ensued. She was initially asked by the court whether she had heard all the questions previously asked to other prospective jurors:

Court: Is there any one of those questions that raised in your mind an answer that might be different?

Kriho: I was involved in a civil court proceeding where we sued a developer down in Boulder District Court. . . .

Court: Was there anything about that experience that makes you unhappy or angry with the judicial system?

Kriho: No.

. . . .

Court: Is there anything, whether I asked it or not, that you can think of that would interfere with your sitting as a fair and impartial juror.

Kriho: No, sir.

Kriho did not mention the fact that, 11 years earlier, she had received a deferred judgment and sentence for possession of Lysergic Acid Diethylamide (LSD). Following entry of the judgment in that case, she had successfully completed two years probation and 40 hours of community service, after which the charges had been dismissed.

She also was asked to give a routine biographical sketch indicating, among other things, her "special interests and hobbies" and to state "anything else" that would prevent her from being a fair and impartial juror. She provided particulars as to her marital status, education, and employment, and various hobbies and interests. She did not mention the fact that she was a member of the Boulder Hemp Initiative Project, an organization that supports the legalization of marijuana in Colorado. Nor did she voice any antipathy towards drug laws or their enforcement.

During individual questioning by the prosecutor, when asked whether she was "familiar with this drug, methamphetamine," she answered: "Just that it is a stimulant." The prosecutor also asked: "You listened to all our topics; would you have answered anything differently?" She answered, "No."

On the first day of deliberations, the jurors reportedly had reached unanimity on two of the counts. According to the testimony presented in the contempt proceeding, Kriho had deliberated with the others and had voted to convict on the criminal impersonation charge, and she also had agreed with the others to acquit on the paraphernalia charge. But, the jurors were divided on the possession of a controlled substance charge with approximately three jurors leaning toward acquittal. By the end of the day, however, Kriho apparently was the sole holdout for acquittal on that count. The jurors were then excused for the evening.

On the second day of deliberations, Kriho remained the sole holdout for acquittal and the mood in the jury room changed as other jurors, apparently irritated with Kriho, urged her to vote to convict. Although Kriho's original refusal to convict was attributed to her assertion that she believed the arresting officer had lied, testimony at the contempt hearing also indicated that she had told the other jurors that drug cases should be handled by the family and community, not by the courts, and that the jury had the right to create the law and to refuse to convict.

She also referred vaguely to the Salem witchcraft trials as an example of intolerable prosecutions and told the other jurors what she believed to be the potential sentence the accused would receive if found guilty of possession. She obtained such information, later found to be inaccurate, at home by use of the Internet. Kriho emphasized the harshness of the penalty in urging the others that they ought not to convict on that count.

At some time during the second day of deliberations, certain of the jurors sent this note to the trial court asking:

Can a juror be disqualified for:

Looking up the sentence on the [I]nternet for the possession charge. IE (4–6 years)

Juror stated the court criminal system is no place to decide drug charges that they should be decided by family and community. Many of my friends aquan (sic) have used illegal drugs.

The court did not inquire further of the jury or attempt to accept a verdict based on the two counts on which the jury had reached unanimity, *see People v. Lewis*, 676 P.2d 682 (Colo.1984), but granted a mistrial.

Following the mistrial and the release of the jurors, Kriho handed one of the other jurors a pamphlet outside the courthouse which purported to be sponsored by the Boulder Hemp Initiative Project and the "Fully Informed Jury Association." It was entitled: "True or False? When you sit on a jury, you have the right to vote your conscience."

It stated, among other things, that:

Most Americans are aware of their right to trial by jury, but how many know that *the jury has more power than anyone else in the courtroom and that in pursuit of a just verdict, jurors are free to judge the merits of the law itself, its use in the case at hand, or the motives of the accused.*

. . . .

Jurors are rarely informed they may vote according to conscience, even after swearing to apply the law as given or told that it's better to hang the jury than to violate one's conscience in order to reach consensus. *These are some of the reasons why FIJA was formed.* (original emphasis)

The juror receiving the pamphlet became angry, returned to the courtroom, and gave it to the judge in the underlying case. According to the contempt hearing testimony, the judge then spoke with certain jurors including Kriho. A few of the jurors also spoke to the prosecutor and expressed anger about Kriho's conduct during deliberations.

Thereafter, the People initiated this contempt action against Kriho pursuant to C.R.C.P. 107 and § 18-1-104(3), C.R.S.1998. The contempt citation alleged that she should be held in contempt for:

(1) disobedience to an order of the court, (2) obstructing the administration of justice, and (3) committing Perjury in the First Degree, C.R.S. 18-8-502, a class 4 Felony, by lying under oath to the Judge and the attorneys.

The prosecution's list of witnesses included the judge, the defense counsel, and certain jurors in the underlying case. The contempt action was ultimately reassigned to a judge other than the one who had presided in the underlying case, and over Kriho's objection, a bench trial rather than a jury trial was conducted.

At the contempt trial, the People alleged the following three areas of concealment by Kriho during voir dire:

[Kriho] failed to reveal that she had previously been arrested, charged with, and pled guilty to a felony charge of Possession of a Scheduled I Controlled Substance and was thereafter granted a deferred judgment and sentence;

[She] failed to reveal that she was opposed to the enforcement of drug laws through the courts and that she was actively involved in an organization which had as its purpose the modification of certain Colorado drug laws; and

[She] failed to reveal that she did not intend to follow the judge's instructions on the law.

The prosecution further asserted that her failures to disclose her prior experience with the justice system, her view that drug cases were a family matter and do not belong in the court system, her unwillingness to follow the law, and her belief that jurors can change the law or disregard it in the jury room, were acts of deliberate deception done with the intent to obstruct justice. According to the prosecution, Kriho did not disclose such information "in order to further her own agenda, her own personal beliefs about the jury system, about drug laws, and whether or not she should or should not convict."

Consistent with its theory that Kriho had no intent to abide by the oath taken at the beginning of voir dire, the People introduced evidence including: (1) a transcript of the voir dire in the underlying criminal case; (2) testimony by a number of the jurors in the underlying case concerning statements Kriho had made during jury deliberations; (3) the information Kriho had obtained from the Internet regarding sentencing; and (4) the fact that, after the mistrial was declared, Kriho had distributed the "juror nullification" pamphlet described above.

Approximately three months after the close of the evidence, the trial court issued a written order finding that two of the prosecution's charges—disobedience to a court order and perjury—had not been sustained. However, it found that Kriho had intended to obstruct the judicial process and that her actions had prevented the seating of a fair and impartial jury. On that basis, the court found her in contempt under C.R.C.P. 107 for obstructing the administration of justice and imposed a $1200 fine payable within one year. It is from this order that Kriho now appeals.

These facts require us to address the following broad issues:

(1) Under what circumstances can a juror be found in contempt for failing to disclose information during voir dire?

(2) Can evidence of jury deliberations properly be considered in such a contempt prosecution?

(3) Was improper evidence admitted and considered in the contempt action against Kriho, and if so, can the finding of contempt be sustained without reference to the improper evidence?

Our consideration of these issues leads us to conclude that, in certain narrow circumstances, a juror can be found in contempt for

the failure to disclose during voir dire information asked for with sufficient specificity, but that the presentation of evidence to prove such contempt must be carefully circumscribed. Because we conclude that improper evidence was considered by the trial court here which affected Kriho's substantial rights, reversal and remand for a new trial are required.

## I. Disruption Not Required

■ Kriho first contends that the trial court erred generally in finding her in contempt of court for actions taken in the presence of the court when those actions were not disruptive to the dignity and authority of the court at that time. We disagree.

■ Under the controlling statute and procedural rule, § 16–10–103, C.R.S.1998; Crim. P. 24(a), prospective jurors have an obligation to answer as completely as possible the questions asked. *People v. Borrelli*, 624 P.2d 900 (Colo.App.1980). Further, a person accepted as a member of a jury becomes a part or member of the court. *See Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

C.R.C.P. 107(a)(1) defines contempt as:

Disorderly or disruptive behavior, a breach of the peace, boisterous conduct or violent disturbance toward the court, or conduct that unreasonably interrupts the due course of judicial proceedings; *behavior that obstructs the administration of justice;* disobedience or resistance by any person to or interference with any lawful writ, process, or order of the court; or any other act or omission designated as contempt by the statutes or these rules. (emphasis added)

*See In re Marriage of Nussbeck*, 974 P.2d 493 (Colo.1999); *Schnier v. District Court*, 696 P.2d 264 (Colo.1985) (decided before rule amended); *People v. Barron*, 677 P.2d 1370 (Colo.1984) (same).

C.R.C.P. 107(a) permits the imposition of remedial and punitive sanctions for behavior that obstructs the administration of justice. A knowing and willful concealment of relevant information by a prospective juror may be an obstruction of the judicial process if it hinders the court's ability to provide a defendant with a fair and impartial jury. *See Clark v. United States, supra.*

Hence, we reject Kriho's general contention that she cannot be held in contempt under C.R.C.P. 107 because her actions during voir dire were not disruptive of the trial proceedings at that time.

## II. Evidence of Jury Deliberations

Relying primarily on *United States v. Thomas*, 116 F.3d 606 (2d Cir.1997), which was announced shortly after the notice of appeal was filed in this case, Kriho next contends the trial court erred in basing its finding of contempt on testimony by jurors in the underlying case concerning statements she had made during jury deliberations. In her briefs, she describes the process employed by the prosecution in proving its case, and the trial court's finding of contempt, as "unprecedented intrusion[s] into the sanctity of jury deliberations."

At issue, therefore, is the extent to which the trial court should have considered, and did consider, the testimony of former jurors regarding the contents of jury deliberations in the contempt action against Kriho for her alleged intentional failure to disclose certain information during voir dire. Our analysis of the law and our examination of the record leads us to conclude that evidence of jury deliberations should not have been, but was considered by the trial court in finding Kriho in contempt. Hence, reversal is required and the cause must be remanded for a new trial.

### A. Procedural Issue

■ Initially, we conclude that the issue of the propriety of admitting jury deliberations is properly before us.

Both parties' briefs and those of *amici curiae* have focused on the propriety of the trial court's consideration of the evidence of jury deliberations and Kriho's challenge to this evidence. In various arguments to the court, and in a pre-trial motion to dismiss, Kriho asserted that she was being punished for what she had said in the jury room during deliberations and because she had

held out for acquittal on the possession count.

In her notice of appeal, Kriho also listed the issues to be raised on appeal as including:

Whether the trial court erred when refusing [her] pre-trial motion for dismissal, based on the assault on the jury system embodied in the prosecution; Whether [Kriho] can be convicted of contempt of court for the thoughts she held during voir dire, thoughts the trial court found corroborated through evidence of her acts and speech during jury deliberations; Whether the trial court erred when it allowed the privilege of jury communications to be breached by [admitting] evidence as to the jury's deliberations; and Whether a juror can be prosecuted based on evidence of her "improper deliberations" without violating the Sixth Amendment right of criminal defendants to trial by a fair and impartial jury.

Furthermore, the People have defended the trial court's consideration of the jury deliberation evidence on the merits and have not asserted that Kriho waived this issue, otherwise failed to preserve it, or that there was invited error.

Accordingly, we believe the issue was adequately preserved and, unlike the dissent, do not further address this procedural issue on appeal. *Cf. Sanchez v. State*, 730 P.2d 328 (Colo.1986) (court of appeals erred in ruling on an issue the parties had not raised or argued in their briefs to that court). *See also Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322 (Colo.1986) (objection to evidence adequately preserved if objection was made in pre-trial motion in limine); *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (fn.2) ("in limine" refers to any motion made before or during trial to exclude anticipated prejudicial evidence).

### B. The *Thomas* Decision

In *United States v. Thomas, supra*, five African–American defendants were charged with selling cocaine. During deliberations, one juror, the only African–American on the panel, insisted that the other jurors did not understand the defendants' situation. Despite considerable evidence of guilt, that juror also insisted the prosecution's case had not been proven.

Eventually, the other jurors notified the court that the recalcitrant juror was not deliberating fairly. After conducting interviews with the jury members, the court dismissed the juror from the panel for allegedly engaging in jury nullification after finding that, in essence, the juror had ignored the evidence and wanted to acquit based on his preconceived ideas concerning the defendants' conduct.

The dismissed juror was replaced and the reconstituted jury panel convicted the defendants. They appealed.

The federal appeals court began its analysis of the issues by categorically rejecting the argument that jury nullification was desirable, stating that:

[A] juror who intends to nullify the applicable law is no less subject to dismissal than is a juror who disregards the court's instructions due to an event or relationship that renders him biased or otherwise unable to render a fair and impartial verdict.

*United States v. Thomas, supra*, 116 F.3d at 614. Nevertheless, it concluded that removal of the recalcitrant juror was improper.

The court further held a juror cannot be removed during deliberations without proof "beyond doubt" that the juror intended to disregard the court's instructions. If there was any possibility that the juror was attempting to apply the law, but simply was unpersuaded by the evidence, the inquiry into deliberations must cease and the juror cannot be removed from the jury. *United States v. Thomas, supra*, 116 F.3d at 608, 621–22.

The court created this exceptionally high evidentiary barrier to the removal of a juror in order to protect the fundamental right of an accused to a unanimous jury and to protect the secrecy of the jury's deliberations. It explained that the vital interest involved was "the core principle of the secrecy of jury deliberations":

The jury as we know it is supposed to reach its decisions in the mystery and se-

curity of secrecy; objections to the secrecy of jury deliberations are nothing less than objections to the jury system itself. ·

*United States v. Thomas, supra,* 116 F.3d at 619. *See United States v. Brown,* 823 F.2d 591, 596 (D.C.Cir.1987) ("[A] court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations.").

The *Thomas* court recognized that its decision left open the possibility "jurors will engage in irresponsible activity that will remain outside the court's powers to investigate or correct." *United States v. Thomas, supra,* 116 F.3d at 622. Nevertheless, in support of its holding, the court stated:

Where the duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, *we are compelled to err in favor of the lesser of two evils— protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity.*

*United States v. Thomas, supra,* 116 F.3d at 623. (emphasis added)

Because there was evidence that the removed juror was deliberating with the other jurors and had some basis derived from the evidence for acquitting the defendants, the *Thomas* court concluded that the trial court had erred in removing him during the deliberations. On that basis, it granted defendants a new trial.

The *Thomas* court's almost *per se* rule prohibiting intrusions into the secrecy of the deliberative process recognizes that our forefathers chose to entrust lay citizens, guided by judges, with the ultimate responsibility of determining guilt beyond a reasonable doubt. That trust in the jury's collective judgment, and the necessity of complete privacy for jurors during their deliberative process, have become bedrock principles in our system of justice. *See Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). *See also Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (discussing FRE 606(b)).

It should also be noted that, while *Thomas* contained a lengthy discussion on the doctrine of jury nullification, it is not so limited. Issues involving the propriety of invading the secrecy of jury deliberations and a charge of contempt against a juror may involve nullification, as well as other types of alleged misconduct during deliberations. *See People v. Metters,* 72 Cal.Rptr.2d 294 (Cal.App.1998) (*cert. granted* ) (holdout juror excused during deliberations; other jurors claimed she was "unfairly sympathetic" to the defendant because she had worked in drug and rehabilitation center, and that this affected her ability objectively to view the facts and law).

We recognize that the juror in *Thomas* was not charged with contempt for his activities in the jury room. Nevertheless, because of its thorough consideration of the issue of jury secrecy, we conclude that the *Thomas* court's analysis offers a focused way of resolving the analogous issue before us.

We thus adopt the conclusion in *Thomas* that the secrecy of jury deliberations is a "core principle" in the American system of justice, that excursions into the jury deliberation process are anathema to our system, and that jury secrecy may be invaded only under the most carefully delineated circumstances. *See* CRE 606(b). The central principle of *Thomas* is that the need to preserve the secrecy of jury deliberations requires an investigation of juror misconduct to cease once "any possibility" arises that the juror is acting during deliberations based on his or her view of the sufficiency of the evidence.

Application of the *Thomas* rule to the circumstances presented by Kriho serves several important purposes. First, it protects jurors, especially lone holdout jurors, from intimidation and from fear that their inability to explain why they favored acquittal, despite a strong prosecution case, might result in criminal charges being brought against them. *See United States v. Brown, supra.* *Cf. Carrillo v. People,* 974 P.2d 478, (Colo. 1999) (allowing substitution of juror during deliberation who had hearing difficulty, but stating that "where the juror excused was a lone holdout for acquittal on one count—extraordinary scrutiny is required . . . .").

In addition, the *Thomas* rule promotes finality in court proceedings by preventing counsel, except under well-recognized and very limited circumstances, from mounting challenges to jury proceedings, or from seeking mistrials during deliberations in cases that appear to have gone badly.

We view it as essential that the standard to be applied with respect to jury secrecy not be speculative or incapable of consistent application. The *Thomas* rule is precise. It involves no balancing tests, but provides trial courts with a bright line rule. Ambiguity and inconsistency are avoided, and reviewing courts are assisted in adjudicating claims that the jury deliberation process has been invaded.

This heightened protection of jury secrecy is especially appropriate, given the fact that the initiation and prosecution of contempt proceedings against jurors for nondisclosure during voir dire have been exceptionally rare occurrences in the history of American jurisprudence. Indeed, we are not aware of any Colorado case in which a juror has been prosecuted for or found in contempt based upon a failure to provide complete or truthful answers to questions asked during voir dire.

Colorado cases concerning the deliberate concealment of material information by jurors during voir dire have focused instead on the remedy afforded to the defendants who were being tried or who were convicted in the underlying cases. In such cases, where juror concealment or other misconduct has been shown, the remedy normally has been removal of the juror from the panel or, following a verdict, an order granting defendant a new trial. *See People v. Garcia*, 964 P.2d 619 (Colo.App.1998) (where record shows juror deliberately disobeyed court's instructions, court has authority to remove juror); *People v. Dunoyair*, 660 P.2d 890 (Colo.1983) (new trial not required by juror's inadvertent failure to disclose his acquaintance with a prosecution witness); *People v. Borrelli, supra* (juror's failure to disclose her severe mental illness and long continued use of psychoactive drugs was a basis for setting aside defendant's convictions and ordering new trial); *People v. Rael*, 40 Colo.App. 374, 578 P.2d 1067 (1978) (juror's nondisclosure of his burglary conviction was misconduct and denied defendant right to exercise a peremptory challenge; prejudice presumed and new trial ordered).

In fact, we have been referred to only a handful of cases in the history of this country in which contempt prosecutions have been initiated against jurors under such circumstances. *See Bays v. Petan Co.*, 94 F.R.D. 587 (D.Nev.1982) (no contempt because trial court found no knowing and willful concealment or false swearing by juror).

Of these, there are only four reported cases in which jurors were convicted of criminal contempt, or otherwise adjudicated in contempt, for failing to disclose information during voir dire.

Three of these cases arose under the federal contempt statute. *See* 18 U.S.C. § 401 (1966). Two of these federal contempt convictions resulted from the jurors' failures to disclose personal knowledge about the cases during voir dire, coupled with the conduct of both jurors in refusing to deliberate with the other jurors. *See Clark v. United States, supra* (juror deliberately failed to disclose that she had been employed by one of the principals in the court action and also refused to deliberate with other jurors); *In re Brogdon*, 625 F.Supp. 422 (W.D.Ark.1985) (juror found in contempt for failing to disclose bias in favor of defendant; evidence showed juror refused to listen to the debate during deliberations).

In the third federal case, a juror was convicted of criminal contempt for his failure to disclose his felony conviction. *See United States v. Lampkin*, 66 F.Supp. 821 (S.D.Fla. 1946) (juror concealed criminal conviction for mutiny on the high seas; case proven by showing contemnor's answers during voir dire and evidence of prior conviction).

Under case law applying the federal statute, contempt by a juror for nondisclosure during voir dire requires the prosecution to show beyond a reasonable doubt that: (1) the prospective juror knowingly and willfully gave an untruthful answer in response to a voir dire question; (2) the untruthful answer was used by the prospective juror to gain acceptance on the jury; and (3) by doing so,

the juror obstructed the administration of justice. *See Bays v. Petan Co., supra.*

The only state court conviction for criminal contempt of which we are aware was based on a juror's failure to reveal that she had a prior felony conviction and that she had independent outside knowledge of the case. The evidence further showed she had used the outside knowledge in an attempt to influence the verdict. *See Witherspoon v. Arkansas,* 322 Ark. 376, 909 S.W.2d 314 (1995).

Thus, while we do not discount the possible danger of excesses by jurors that the prosecution seeks to prevent here, there is also a danger in overreacting to a perceived threat that the paucity of cases indicates is far more apparent than real. The danger of such overreaction is that we could impair public confidence in a jury system that has served Colorado well since pre-territorial days when its early settlers formed *ad hoc* People's Courts and Miners' Courts. *See* Hal Sayre Collection (7–7), Record, Miners Court, Gregory District, Central City (1859–60), Archives, University of Colorado at Boulder Libraries; Robert Lawrence Stearns, *Colorado: A Study in Frontier Sovereignty* 17, Address at the Thirtieth Annual Meeting of the American Association of Law Libraries in Joint Session with the National Association of State Libraries (June 26, 1935) (Reprinted in 28 *Law Library Journal,* Number 3 (July 1935)) (on file at Colorado Supreme Court Library).

Another danger is that we could chill the willingness of our citizens to serve on juries which they now do, often at considerable personal sacrifice.

### C. Applicability of the *Thomas* Decision

■ At the time of Kriho's contempt trial, the trial court did not have the benefit of the *Thomas* decision, and the record reflects that the court was mindful of the need to balance the important interests involved. Nevertheless, there was considerable testimony at the contempt hearing that Kriho had, to some extent, properly performed as a juror by engaging in lengthy deliberations with the other jurors on the issues raised by the evidence. There was also testimony that she had some evidentiary basis for her decision on the possession charge.

More specifically, the testimony showed that: (1) after deliberating for part of one day and most of the next day, Kriho and the other jurors reportedly had agreed on a verdict of guilty on the criminal impersonation count and not guilty on the possession of drug paraphernalia count; (2) during deliberations, several jurors had changed their minds on all three counts; (3) all of the jurors, including Kriho, had participated in a discussion of the evidence on the three charges; (4) there was argument in the jury room that although a small amount of drugs had been found in the bottom of defendant's purse, "[S]omebody could have put it there."

One juror testified that:

[W]e were talking about it and a lot of them was [sic] saying that how could she put it on the bottom of the purse ... and there was [sic] some jurors who were saying that she must have known that it was in her purse.

Question: And were there jurors who argued that they didn't believe that the prosecutor had proved his case on that point [of knowing possession]?

Juror: Right.

Question: And you remember what the arguments were.

Juror: We all had differences. I mean a lot of us had different things to say about it....

Question: Was there one person who said she might not have known it was in her purse?

Juror: Yes. I think it got down to about three people.

. . . .

Question: So [Kriho] was one of the three who wasn't convinced that the prosecutor had shown that the defendant knew she had a drug in her possession?

Juror: That's about the way I look at it.

Another juror testified that Kriho "just kept on reiterating that I just don't see there's evidence beyond a reasonable doubt."

Under *Thomas,* once the evidence shows "any possibility" that a juror was attempting

to apply the law, but simply was unpersuaded by the evidence, all further inquiry into the jury deliberations should end. In our view, the above testimony brings this case within the scope of the *Thomas* mandate and there should have been no further testimony about jury deliberations. Because inquiry concerning jury deliberations did not cease, we conclude that the evidence of those deliberations was erroneously considered by the court.

We reach the same conclusion with respect to the brief testimony by a juror in the underlying case regarding a conversation with Kriho which took place while deliberations were ongoing, but during a short break outside the deliberation room. Because this testimony was admitted in connection with, and as explanatory material to, statements made by Kriho during deliberations, we conclude that it was inextricably intertwined with the jury deliberations. It is thus governed by our conclusion that evidence of deliberations should not have been admitted.

Given our conclusion that this evidence was so demonstrably tied to jury deliberations as to have been improperly admitted, we need not determine whether this testimony also violated the court's general instructions to jurors that they deliberate together only in the jury room. *See COLJI–Crim.* No. 1:03, No. 1:04, No. 38:04; *cf. Tanner v. United States, supra* (trial court should not consider affidavit obtained from juror in violation of trial court's order not to contact jurors).

### D. Use of Internet

■ We also do not determine whether there was a basis for admitting evidence of deliberations pursuant to CRE 606(b) as extraneous prejudicial information.

Kriho admitted at the contempt trial that she had been told "not to speak to anyone about the case." However, she contended that obtaining information from the Internet did not violate that instruction because it was not tantamount to "speaking to anyone" about the case. In any event, she maintained that she had not deliberately violated the court's instruction.

Kriho also challenged the necessity for the mistrial in the underlying case. Specifically, her counsel attempted to elicit testimony at trial showing that the mistrial was not Kriho's fault, and that "a verdict could have been reached and mistrial could have been avoided." The trial court disallowed the evidence, stating that: "[T]he fact that this ended in a mistrial has [nothing] to do with the issues before this Court today."

Because the trial court did not determine whether Kriho's action, in obtaining the sentencing information from the Internet, constituted a violation of the specific instructions given by the court, or constituted extraneous prejudicial information within the meaning of CRE 606(b), we do not address the issue involving Kriho's use of the Internet. Nor do we determine whether there was a basis for admitting any evidence of deliberations pursuant to CRE 606(b).

It is also unclear whether CRE 606(b) would apply to a mistrial or is limited to verdicts. Colorado has not addressed the issue and there is a split of authority in other jurisdictions. *See Witherspoon v. Arkansas, supra* (holding that the Arkansas counterpart to CRE 606(b) applies whether a verdict is reached or a mistrial declared, and, under the extraneous information exception, allows jurors to testify about statements made during deliberations); *but see Bays v. Petan Co., supra* (Fed.R.Evid.606(b) does not apply where inquiry is whether respondent should be held in contempt because there was no verdict).

### III. Applicability of the *Clark* Decision

The People do not dispute that evidence of the jury deliberations was used to prove the contempt allegations against Kriho. They maintain, however, that such evidence was admissible to corroborate its theory that she lied during voir dire to become a member of the panel, and that her goal was to disregard the trial court's instructions and acquit the accused in the underlying case against the weight of the evidence or, alternatively, to hang the jury and cause a mistrial.

In support of its argument, the People heavily rely on *Clark v. United States, supra.* However, we perceive no inconsistency be-

tween our conclusion and the holding in *Clark*.

*Clark* was a 1933 federal criminal contempt action brought against a juror. The prosecution showed the juror had deliberately concealed during voir dire the fact that she knew one of the principals in the court case in which she served. The evidence at the contempt trial also showed that this juror had cast the single vote for acquittal, and that she had refused to deliberate by placing "her hands over her ears when other jurors tried to reason with her." *Clark v. United States, supra*, 289 U.S. at 9, 53 S.Ct. at 467–68, 77 L.Ed. at 997. Thus, the focus was on the juror's conduct during deliberations.

The defendant in *Clark* based her objection to the use of the jury deliberations on a claim of privilege. The United States Supreme Court rejected her argument that allowing testimony regarding the jury deliberations was a denial or impairment of a lawful privilege. It ruled instead that, if a prima facie case of juror wrongdoing first was shown to the court's satisfaction, jury discussions were admissible "as corroborative evidence, supplementing and confirming the case that would exist without them." *Clark v. United States, supra*, 289 U.S. at 14, 53 S.Ct. at 469, 77 L.Ed. at 1000.

In explaining its rule, the Court stated:

[Clark] has not been held to answer for any verdict that she has rendered, nor for anything said or done in considering her verdict. . . . What was said and done in the jury room is not the gist of her wrongdoing. What was said and done in the jury room is no more than confirmatory evidence of her state of mind before.

*Clark v. United States, supra*, 289 U.S. at 17–18, 53 S.Ct. at 470, 77 L.Ed. at 1001–02.

In *Clark*, the testimony about the statements during jury deliberations was merely confirmatory. In contrast, here, notwithstanding the trial court's statements to the contrary, Kriho's comments during jury deliberations were pivotal to the prosecution's case. It heavily emphasized that evidence to support its theory that she deliberately lied to the court during voir dire, motivated by a desire to be selected on the jury and to interfere with the jury system.

This emphasis can be seen in the prosecutor's closing argument. He assured the court that Kriho's decision-making in the jury room on the issue of guilt had nothing to do with the case. Yet, in asking the court to assess her motive for the nondisclosures, the prosecutor frequently referred to, and relied on, Kriho's statements in the jury room. He asserted that her statements during deliberations urging the others to vote for acquittal supported the prosecution's theory that Kriho's limited answers to the court and counsel, and her nondisclosures during voir dire, were acts of deliberate deception. And, according to the prosecutor, they were done for the purpose of obstructing justice by hanging the jury.

Furthermore, in its order finding Kriho in contempt for obstruction of justice, the court repeatedly referred to the evidence of jury deliberations. Despite its earlier statements in the contempt trial that Kriho could not be found in contempt based on what was said in the jury room, the trial court found that:

(1) *the testimony of several jurors that at various times during jury deliberations* they brought to Ms. Kriho's attention that they were to follow the law even if they disagreed with it; (2) that Kriho chose not to reveal her strong feelings about [following the law]; (3) *Testimony of Ms. Kriho's fellow jurors revealed that she informed these jurors that she did not believe drug laws should be enforced through the courts and she discussed her belief that jurors did not have to follow the law if they did not agree with it*; (4) the jury deliberation pamphlet handed out by Kriho after the trial contained *the same concepts Ms. Kriho was espousing in the jury room*; and (5) *a mistrial was pre-ordained.* (emphasis added)

The court's ultimate finding that Kriho was in contempt also referred to the testimony about deliberations. Likewise, its conclusion regarding Kriho's motive—that she had "deliberately withheld this information [about her prior experience with the court system and her views on the drug laws] from the trial court and the parties so that she could

be selected to serve on the jury and obstruct the judicial process"—is saturated with references to the jury deliberations, as is the court's conclusion that she "obstructed the process of selecting a fair and impartial jury."

The trial court's additional finding, that "Kriho's lack of candor about her experiences and attitudes led to the selection of a jury doomed to mistrial from the start," also cannot be sustained without reference to what Kriho told the other jurors during deliberations.

Thus, while the trial court repeatedly and correctly assured Kriho that she could not be punished for her opinions during deliberations or how she voted there, we nevertheless conclude that crucial findings of fact and conclusions of law made by the court were based on the other jurors' testimony of what Kriho and others had said during deliberations. This testimony should not have been considered under *United States v. Thomas, supra,* and is not consistent with the holding of *Clark v. United States, supra,* which was decided on a non-constitutional basis.

As noted above, the *Clark* decision also does not permit evidence of jury deliberations unless the trial court first finds a prima facie case has been shown by the prosecution. That foundational requirement was not met in Kriho's contempt trial.

Accordingly, contrary to the People's contention, we conclude that *Clark* does not require a different result here.

### IV. Sufficiency of the Evidence

Our analysis above requires that we address the issue whether the trial court's contempt finding can be sustained without considering the testimony about what was said by jurors during deliberations, or whether, as Kriho asserts, she is entitled to dismissal of the contempt.

■ The issue of the sufficiency of the evidence is a question of law. *See People v. Gonzales,* 666 P.2d 123 (Colo.1983). In determining sufficiency of the evidence, a reviewing court must determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is suffi-

cient to support a conclusion by a reasonable person that the defendant is guilty beyond a reasonable doubt of the crimes charged. *Kogan v. People,* 756 P.2d 945 (Colo.1988).

■ In a trial to the court, there is a presumption that all incompetent evidence is disregarded by the court in reaching its conclusions, and the judgment will not be disturbed unless it is clear that the court could not have reached the result but for the incompetent evidence. *People v. Mascarenas,* 181 Colo. 268, 509 P.2d 303 (1973). However, this presumption generally does *not* apply if the trial court accords weight to the improper evidence in its decision. *People v. Fulton,* 754 P.2d 398 (Colo.App.1987).

We conclude that the trial court did accord considerable weight to the improper evidence in Kriho's contempt trial.

### A. Beliefs About Drug Laws and Jury System

■ As detailed earlier, in support of the prosecution's theory that Kriho deliberately lied "in order to further her own agenda," it presented six witnesses, all of whom were former jurors. All but the alternate testified about what was said during deliberations.

If that evidence is excluded, the People's evidence consisted only of the following: (1) a transcript of the voir dire in the underlying case; (2) documents showing Kriho's prior arrest and deferred judgment; (3) her distribution of the nullification pamphlet after the mistrial was declared; (4) her letter to the editor of a local newspaper in 1994 stating an opinion about the use of industrial hemp; and (5) a July 1994 newspaper article about the Boulder Hemp Initiative Project's attempts to legalize marijuana use, which quoted Kriho as a project organizer.

We conclude that this remaining evidence, viewed in the light most favorable to the prosecution, is insufficient as a matter of law to find Kriho in contempt based on her alleged failure to reveal that she opposed the enforcement of drug laws through the courts, and her alleged failure to reveal that she did not intend to follow the judge's instructions on the law. On remand, the trial court

should dismiss the citation for contempt insofar as it was based on those allegations.

Given this conclusion, it is unnecessary for us to address the vitality, if any, of the doctrine of nullification in Colorado. *See People v. Wilson*, 972 P.2d 701 (Colo.App. 1998). Similarly, we need not discuss Kriho's contention that her First Amendment rights were violated and that her prosecution was based on the opinions she expressed in the local newspaper.

## B. The Hemp Initiative Project

■ Kriho next asserts that her failure to disclose her involvement in the Boulder Hemp Initiative Project cannot be a basis for a finding of contempt because she was not asked specific questions requesting such information during voir dire. Under the circumstances at issue, we agree.

■ Jurors have a duty to answer truthfully, but voir dire examination "always must be interpreted in the light of realities of the setting in which it occurs." *Bal Theatre Corp. v. Paramount Film Distributing Corp.*, 206 F.Supp. 708, 721 (N.D.Cal.1962).

In reversing a finding of contempt by a juror, the court in *In re Mossie*, 768 F.2d 985 (8th Cir.1985), recognized the duty of jurors to answer questions honestly, but concluded that voir dire questions must be read literally. The court cautioned that:

> [H]onest answers hinge on fair interpretations of the voir dire questions, and when lay people and lawyers use legal language together, the resulting ambiguity can create great interpretive problems.
>
> . . . .
>
> Although we recognize the burden this places on the courts and on parties in formulating voir dire questions, any other result shifts the burden of precision and legal interpretation away from the court and onto lay jurors, who might then be held accountable for their misunderstandings. This result would be neither just nor prudent.

*In re Mossie, supra*, 768 F.2d at 986. *See also United States v. Rhodes*, 556 F.2d 599, 601 (1st Cir.1977) ("jurors, ignorant of voir dire procedure, are to be held to the question asked, and not to some other question that should have been asked"); *Redman v. United States*, 77 F.2d 126 (9th Cir.1935) (reversing contempt conviction and discussing the danger of intimidating jurors with contempt prosecutions based upon general questions during voir dire, especially those jurors who leaned toward acquittals).

■ Thus, in a juror contempt prosecution, any ambiguity in the questions asked should inure to the benefit of the juror.

Applying that principle here, we agree with Kriho that the general questions asked of her during voir dire about "hobbies and special interests," were insufficient to create a duty to inform the court of her membership in the Boulder Hemp Initiative Project which, among other things, supports the legalization of marijuana in Colorado.

One's membership in a political action committee such as the Boulder Hemp Initiative Project is not *per se* a hobby. While it arguably may be a special interest, the jurors here were asked a very general question. Reasonable persons could easily differ as to how extensively the question should be answered. Unlike certain cases in which jurors are given lengthy questionnaires, here, they were not told they were expected to state any more than their general interests. Nor was marijuana involved in the underlying case.

Hence, while Kriho's association with a group supporting the legalization of marijuana might have been a valid area of inquiry by counsel, looking at the particular questions asked of jurors, which were somewhat ambiguous, we conclude Kriho was not under a duty to disclose that association as a "special interest" during the voir dire at issue here. *See In re Mossie, supra ; United States v. Rhodes, supra.* Although there were other questions asked about drug laws and controlled substances, the People have offered no other basis on which that particular disclosure should have been made.

We therefore conclude that a finding of contempt cannot be premised on the failure of Kriho to disclose her involvement in the Hemp project. On remand, the trial court

should dismiss the citation for contempt insofar as it relies on that allegation.

### V.  Prior Contacts with Court System

■ Kriho also maintains that she was not asked about arrests or about her prior deferred judgment and that the contempt citation should have been dismissed as a matter of law insofar as it was based on that allegation. We are not persuaded that Kriho is entitled to dismissal on that ground. However, we do conclude she is entitled to a new trial on that allegation.

We recognize that there exist certain ambiguities concerning the legal effect of a deferred judgment. *See* § 16–7–403(2), C.R.S. 1998; *Weber v. Colorado State Board of Nursing*, 830 P.2d 1128 (Colo.App.1992) (nurse could not be disciplined for having been convicted of a felony during pendency of deferred judgment, but could be disciplined for procuring or attempting to procure nursing license by fraudulent means); *Hafelfinger v. District Court*, 674 P.2d 375 (Colo. 1984) (after withdrawal of plea to deferred judgment, earlier acceptance of the guilty plea is vitiated); *In re Mossie, supra* (contempt could not be premised on failure to disclose guilty plea to marijuana possession that was not a "crime" under Missouri law); and *Bays v. Petan Co., supra* (no contempt because juror's untruthful answer in voir dire was not given knowingly or willfully).

In the underlying case, the entire panel was asked broad questions including: "Has anybody in the panel been accused of a crime other than traffic stuff? Had to go to court for something?" They were also asked if they had had "[a]ny experience with the justice system? Positive or negative?"

In our view, an appropriately responsive answer to these questions necessarily would have required Kriho to disclose her prior arrest and deferred judgment. *Cf. People v. Rael, supra* (juror's failure to disclose during voir dire that he had felony conviction was misconduct which constituted grounds for new trial; contempt not involved).

There are two reported cases in which jurors have been convicted of criminal contempt for nondisclosures during voir dire

which involved their failure to disclose prior felony convictions. In both cases, the prosecution presented proof of such an allegation that was largely independent of the evidence of jury deliberations. *See United States v. Lampkin, supra; Witherspoon v. Arkansas, supra.*

■ Thus, we perceive no reason why a finding of contempt similarly cannot be brought under C.R.C.P. 107, and proved with evidence other than jury deliberations, provided the prosecution can show beyond a reasonable doubt all of the required elements. Taking guidance from the federal decisions and the language of C.R.C.P. 107(a)(1), those elements in Colorado are: (1) the prospective juror knowingly and willfully gave an untruthful answer or deliberately failed to disclosure information during voir dire in response to a specific question asked; (2) the purpose of the juror's untruthful answer or nondisclosure was to gain acceptance on the jury and to obstruct the administration of justice; and (3) the juror's untruthful answer or nondisclosure did obstruct the administration of justice.

■ Here, it is undisputed that Kriho failed to disclose her prior arrest and deferred judgment for possession of LSD. Nevertheless, because inadvertent or negligent disclosure is not contumacious, Kriho's motivation was crucial in determining whether her failure to disclose the information was deliberately done to obstruct justice, or whether, as she has maintained, she believed the prior proceeding had been expurgated and that she had no duty to disclose it. *See Clark v. United States, supra; Redman v. United States, supra,* 77 F.2d at 129 (Wilbur, J., concurring) ("A man should not be sent to jail for forgetfulness.").

We further acknowledge that it was within the trial court's prerogative as factfinder to evaluate the properly admitted evidence and to have resolved the credibility question against Kriho. However, in resolving the dispositive issues of motive and intent, the trial court referred extensively to and relied on her statements during deliberations. And, because significant portions of its findings and conclusions regarding Kriho's intent and motive were inextricably intertwined

with the jury deliberation evidence, we cannot say with confidence that the trial court would have reached the same result without consideration of the jury deliberation evidence.

Accordingly, we conclude that the finding of contempt cannot stand insofar as it was based on the People's allegation that Kriho failed to reveal her prior contact with the court system, and that remand for a new trial on this one remaining allegation is required. At the new trial, for the reasons stated earlier, no evidence shall be admitted regarding the jury deliberations in the underlying case.

## VI. Ambiguity of Trial Court Order

Before any retrial occurs on the sole remaining allegation, the trial court should clarify an ambiguity in its order.

Following the evidence, it concluded that two of the three counts alleged by the prosecution could not be sustained, rulings no longer subject to reconsideration due to double jeopardy principles. Specifically, the court determined that the allegation of disobedience to a court order failed as a matter of law because the instructions to the jury in the underlying case were not "court orders," and therefore could not support a finding of contempt.

However, as to the allegation of contempt based upon perjury, the trial court's order stated only that:

On the issue of Ms. Kriho committing perjury, this Court finds in favor of Ms. Kriho and against the People. The case of *Murer v. Rogowski,* [29 Colo.App. 235], 480 P.2d 853 (Colo.App.1971) sets forth specific conditions under which perjury can constitute contempt of court. *The evidence in this case does not meet those conditions.* The absence of those conditions did not deprive the District Attorney of all remedies. The District Attorney could have filed a criminal charge against Ms. Kriho if he had chosen to do so. (emphasis added)

In *Murer,* a division of this court set aside a trial court's order finding that defendant was guilty of contempt for having perjured himself. There, the evidence consisted of collateral evidence introduced by plaintiff to impeach the defendant's testimony, and not upon anything inherently incredible or self-contradictory.

The issue in *Murer* was whether the perjury had the effect of substantially obstructing or halting the judicial process. The panel concluded that, because defendant's perjury was not "manifest," but required collateral proof, and there was no other evidence that the perjury obstructed or halted the judicial process, the contempt could not stand. *See Ex Parte Hudgings,* 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919) (technical perjury does not constitute criminal contempt unless it also amounts to an obstruction to the administration of justice); *Handler v. Gordon,* 111 Colo. 234, 140 P.2d 622 (1943) (trial court may punish defendant for contempt for manifest perjury committed in its presence).

As in *Murer,* Kriho's answers during voir dire did not constitute manifest perjury in the presence of the court. Collateral proof was required to determine whether she had lied about a material aspect of the proceedings and whether such obstructed the judicial process.

An ambiguity exists here because, unlike the situation in *Murer,* the trial court found that Kriho was specifically asked for the information, that she had deliberately withheld material information from the court, and that she "did so with the intent of serving on the jury for the purpose of obstructing justice." In other words, it found that she had lied to the court for the purpose of serving on the jury. It also found that her lies had obstructed justice.

Based on these findings, the court then concluded that the contempt based on obstruction of justice *had* been proven, but that the contempt based on perjury allegation *had not* been sustained. It did not explain why the evidence in this case supported one count, which required proof beyond a reasonable doubt of material falsity and obstruction of justice, but did not support the other count, nor how the evidence failed to meet the conditions of *Murer v. Rogowski, supra.*

■ Falsification or evasion may fall short of technical perjury, but may still con-

stitute contemptuous conduct if its tendency is to obstruct the administration of justice. *See Clark v. United States, supra.* Nevertheless, here, we are unable to determine how the trial court rejected the People's evidence of contempt arising from perjury, while at the same time making a finding of contempt for obstruction of justice. Nor can we determine if Kriho is entitled to benefit from this inconsistency.

On remand, the trial court should clarify its order and determine the effect, if any, of such clarification on the remaining allegation.

### VII. Due Process Violations

Because they may arise on retrial, we next address Kriho's contention that her due process rights were violated by: the trial court's refusal to allow her to call the prosecutor and the judge in the underlying case as witnesses; its refusal to appoint a special prosecutor; its denial of her right to a jury trial; and the judge's failure to recuse himself. We reject each contention in turn.

### A. Calling Judge as a Witness

■ A strong public policy prohibits judges from being called as witnesses to state the grounds upon which they decided former cases. *People v. Drake,* 841 P.2d 364 (Colo.App.1992). A judge's testimony is inadmissible to prove or contradict a judgment because the record is the best evidence of the judgment. *People v. Tippett,* 733 P.2d 1183 (Colo.1987).

■ In this case, the prosecution initially named the trial judge as one of its witnesses and then decided not to call him. When the defense also asked to call him as a witness, the prosecution objected. The defense then filed a written offer of proof stating its specific reasons for wanting to elicit testimony from the judge.

These reasons included the fact that the judge could testify about what orders he gave and what orders may have been disobeyed; he could testify that defendant's answers on voir dire were straightforward and that certain questions were put to certain jurors but not to defendant; and that he could establish, based on his experience on the bench, not to expect answers to questions which are not asked. Although Kriho asserts on appeal that the trial judge may have had a conversation with her after the mistrial was declared and, therefore, may have relevant information as a fact witness, an insufficient offer of proof was made to show the relevancy of that testimony.

Because the defense failed to show that calling the judge was necessary to the presentation of its case and because most of the proposed evidence could be obtained from the record of the underlying trial, we conclude that the trial court did not err in refusing to allow Kriho to call the judge in the underlying case as a witness.

### B. Failure to Appoint Special Prosecutor

■ We also reject Kriho's contention that the trial court abused its discretion in refusing to appoint a special prosecutor to her case.

· Section 20–1–107, C.R.S.1998, grants the district court discretion to disqualify the district attorney from a case and appoint a special prosecutor if the district attorney is interested in the outcome of the case. *People ex rel. Sandstrom v. District Court,* 884 P.2d 707 (Colo.1994). The statute was designed to permit the appointment of a special prosecutor only when the district attorney has an interest in the litigation apart from his or her professional responsibility of upholding the law. *People v. District Court,* 189 Colo. 159, 538 P.2d 887 (1975).

■ The policy considerations involved in making this discretionary decision are broad, involving issues of public confidence in the integrity and efficiency of the legal system. *People v. County Court,* 854 P.2d 1341 (Colo. App.1992).

Kriho asserted that the deputy district attorney who prosecuted the underlying case would be a key witness and that his testimony was needed to exonerate her. The defense also asserted there had been improper contact between the prosecution and a county court judge who had authored an article on the subject of jury nullification.

However, the trial court found that: (1) the deputy district attorney did not have evidence relevant to the issues raised in the contempt citation that would disqualify him from further prosecution of the case; and (2) any discussions between the district attorney and the county court judge were irrelevant and would not interfere with the district attorney's ability to prosecute the case.

There was a verbatim transcript of the voir dire proceedings which sets forth the statements that were made by the court, the questions that were asked on voir dire by counsel, and the responses given by Kriho and other prospective jurors. Thus, because the district attorney's evidence could have been obtained more accurately from the transcript, the trial court concluded that the deputy district attorney's testimony was unnecessary.

Reasonable minds could differ whether allowing the same prosecutor to remain in the case created an appearance of impropriety, where it has been alleged that the prosecutor may have been a fact witness and originally had designated the first trial judge and the defense counsel in the underlying case as prosecution witnesses. However, we cannot say that the trial court's determination to the contrary was an abuse of discretion.

### C. Failure of Judge to Recuse Himself

■ Kriho next asserts that the trial judge erred in failing to recuse himself. We disagree.

Kriho's argument for recusal was that all judges in the First Judicial District were too closely connected with this particular case and, therefore, that they should have all recused themselves from hearing the contempt charges. This argument was based on an article written by a county court judge concerning the jury nullification. However, no written motion for recusal under C.R.C.P. 97 was filed by Kriho.

Further, the judge hearing the contempt violation did not preside at the underlying trial. He had not authored any articles concerning jury nullification, and had not been exposed to outside information about the case. The fact that the contempt citation

occurred in a court within the same judicial district in which the case was heard does not give rise to an inference of any impropriety on the part of a particular judge.

We have read the record carefully and we are fully satisfied that the trial court was impartial and did everything within its power to ensure a fair trial to the parties.

Under these circumstances, we conclude that the trial judge did not err in failing *sua sponte* to recuse himself.

### D. Right to Jury Trial

■ We also reject Kriho's contention that she was improperly denied her right to a jury trial.

In *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the Supreme Court held that a defendant has a constitutional right to a jury trial in a serious criminal contempt proceeding. *See Lewis v. United States,* 518 U.S. 322, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996) (in determining whether offense is sufficiently serious as to grant right to jury trial, primary emphasis should be on maximum prison term authorized, rather than on other penalties such as fines or probation); *United States v. Unterburger,* 97 F.3d 1413 (11th Cir.1996) (maximum term of imprisonment of six months and fine of $10,000 not sufficiently severe to entitle defendant to a jury trial); *In re Brogdon, supra* (criminal contempt determined to be a "petty offense" rather than a "serious offense," and respondent was not entitled to jury trial).

C.R.C.P. 107(d) provides that the maximum jail sentence for one found in contempt of court shall not exceed six months unless the person has been advised of the right to a jury trial. *See People v. Zamora,* 665 P.2d 153 (Colo.App.1983).

Before Kriho was tried for contempt, the People filed a document entitled "Notice of Maximum Sentence Not to Exceed Six Months," which established that the People would not seek a jail sentence exceeding six months. The court treated the People's Notice as an irrevocable stipulation that Kriho could not receive a sentence exceeding six months. Accordingly, we reject Kriho's as-

sertion that she was denied the right to a jury trial.

The remainder of Kriho's arguments are moot.

The order finding Kriho in contempt for obstructing the administration of justice is reversed and the cause is remanded for a new trial consistent with the views expressed in this opinion.

Judge JONES concurs.

Judge KAPELKE concurs in part and dissents in part.

Judge KAPELKE concurring in part and dissenting in part.

I concur in the analysis and conclusions of the majority as to Parts I and VII of its opinion. However, because Kriho has not challenged the admissibility of the evidence regarding jury deliberations in the underlying case, and because I believe the trial court's contempt order is supported by the record, even excluding that evidence, I would affirm. Accordingly, I respectfully dissent from the majority's conclusion that reversal and remand are required.

This punitive contempt proceeding arises from a 1996 criminal proceeding in which Kriho served as a juror. That case (the underlying case) involved charges of unlawful possession of a controlled substance (meth-amphetamine), criminal impersonation, and unlawful possession of drug paraphernalia.

At the beginning of the trial in the under-lying case, the court informed Kriho and the other prospective jurors of the criminal charges involved. The court then told them of the importance of their listening to all the questions it asked, as well as those asked by the attorneys, and explained the need to obtain a fair and impartial jury. Kriho and the other jurors took an oath in which they agreed to answer truthfully the questions asked by the court or counsel concerning their service as jurors on the case.

After some of the prospective jurors had been called into the jury box, the court asked numerous additional questions, including the following: "Has anybody in the panel been accused of a crime other than traffic stuff? Had to go to court for something?"

In response to the question, one potential juror indicated that he had been accused of vandalism and that his case had gone to trial. Another prospective juror indicated that his son had had a problem with drugs and, as a result, had become involved in the justice system in connection with his use of marijua-na.

The prosecutor in his voir dire asked the jurors in the jury box the following ques-tions: "[D]oes anyone have any particular strong feelings, either pro or con, about the laws we have including the law that will apply here that you will get from his Honor ... about the control of dangerous drugs or controlled substances? In other words, it is against the law to possess methamphetamine and that is why we're here. Does anybody have any particular views about these laws including specifically this one?"

Thereafter, the prosecutor went on to ask individual members of the panel whether they had "any particular views one way or another about the laws in this area?"

After she was called into the jury box, Kriho stated that she had heard all the ques-tions asked by the court and counsel. She was then asked whether any of the questions raised in her mind an answer that might be different from those given by others. She mentioned that she had been involved in a court proceeding in Boulder District Court involving a suit against a developer. Finally, the court asked if she could think of anything that would interfere with her sitting as a fair and impartial juror. She replied in the nega-tive.

The trial in the underlying case resulted in a mistrial after some of the jurors sent the following note to the court:

Can a juror be disqualified for:

Looking up the sentence on the internet for the possession charge. IE (4–6 years)

> Juror stated The court criminal system is no place to decide drug charges that they should be decided by family and community. Many of my friends aquan (sic) have used illegal drugs.

In July 1996, the People filed a motion for contempt against Kriho which included allegations that in the underlying criminal action: 1) she had not disclosed that she had been arrested in 1984 for possession of a controlled substance (LSD) and had pled guilty and received a deferred judgment and sentence for that offense; and 2) she had not disclosed that she had views in opposition to existing drug laws.

At Kriho's trial on the contempt motion, the People placed in evidence, among other things, the transcript of the voir dire questions at the trial of the underlying case and documents relating to Kriho's deferred judgment on the controlled substance possession charge. In addition, they introduced evidence showing that Kriho was active in the Boulder Hemp Initiative Project, an association advocating the legalization of marijuana use.

The People called as witnesses six of the jurors in the underlying trial. Kriho did not object to the testimony of those jurors concerning and revealing what had transpired in the jury deliberations. Kriho herself called one of the jurors in the underlying trial as a witness, and that juror also described what had taken place in deliberations. In addition, in her own testimony, Kriho discussed the deliberations and even indicated how she had voted on the charges and for what reasons.

## I.

In my view, the admissibility of the evidence concerning jury deliberations is not before us, nor is the propriety of the trial court's having considered that evidence. As noted, Kriho did not challenge the testimony in the trial court on that subject and even presented her own evidence detailing what occurred during the deliberations. Also, before trial she had listed all the jurors in the underlying trial as prospective witnesses.

To the extent that Kriho failed to object to the admission of the evidence presented by the People, our review would generally be for plain error. *People v. Kruse*, 839 P.2d 1 (Colo.1992). Under that standard, reversal is not required unless the error casts serious doubt upon the basic fairness of the trial itself. *Wilson v. People*, 743 P.2d 415 (Colo. 1987).

Here, however, because Kriho not only failed to object but also submitted substantial evidence of her own as to what happened in the deliberations, an analysis based on waiver or even invited error would seem more appropriate. Under the invited error doctrine, a party may not complain on appeal of an error that he or she has invited or injected into the case. *See People v. Zapata*, 779 P.2d 1307 (Colo.1989); *People v. Shackelford*, 182 Colo. 48, 511 P.2d 19 (1973).

Notably, in *Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), the leading case on contempt based on juror misconduct, Justice Cardozo pointed out that, to the extent the alleged contemnor there had voluntarily disclosed what occurred in deliberations, she had waived any privilege to protect the confidentiality of that information.

In its opinion the majority suggests that Kriho adequately challenged the admissibility of the evidence of juror deliberations in a pre-trial motion. However, none of the pre-trial motions addressed the admissibility of such evidence. Accordingly, I cannot share the view that the issue of admissibility has been preserved.

Finally, and significantly, *even in this appeal* Kriho did not contend either in the briefs or at argument that the evidence regarding the juror deliberations should not have been admitted by the trial court. While she identified admissibility of the evidence as an issue in her notice of appeal, by having failed to address it in the briefs she is deemed to have abandoned it, and we cannot properly rule on the issue. *See Sanchez v. State*, 730 P.2d 328 (Colo.1986).

Under these circumstances, I can find no basis for reversal based on either the admission of the evidence or the court's having considered it in determining whether Kriho deliberately failed to disclose pertinent information in the voir dire, whether she did so with the purpose of gaining acceptance upon the jury, and whether she obstructed the administration of justice.

I appreciate the vital importance of safeguarding the secrecy of jury deliberations and the critical policy concerns expressed in *United States v. Thomas*, 116 F.3d 606 (2d Cir.1997). Indeed, in *Clark v. United States*, *supra*, 289 U.S. at 13, 53 S.Ct. at 469, 77 L.Ed. at 999, the Supreme Court emphasized that "freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world."

Nevertheless, under *Clark* and its progeny, there is no absolute bar to admission or consideration of evidence of juror deliberations in a later proceeding concerning alleged juror contempt. Rather, the Court stated in *Clark* that there first has to be a *prima facie* presentation sufficient to show the court "that the light should be let in." *Clark v. United States, supra*, 289 U.S. at 14, 53 S.Ct. at 469, 77 L.Ed. at 1000. *See also Bays v. Petan Co.*, 94 F.R.D. 587 (D.Nev.1982) (allowing evidence of juror deliberations but ultimately finding that juror had not acted willfully); 8 J. Wigmore, *Evidence* § 2354 (McNaughton rev.1961); 3 J. Weinstein, M. Berger & J. McLaughlin, *Weinstein's Evidence* § 606[4] (1966).

Here, the trial court in its written findings determined that such a *prima facie* showing had been made. It is evident, however, that such a showing was not made *before* the first of the jurors began testifying about the deliberations. At that point, the court had before it the transcript of the voir dire but had not yet received evidence as to the information withheld by Kriho, such as that regarding her prior deferred judgment on a drug possession charge.

Nevertheless, given the failure of Kriho to challenge the testimony about juror deliberations, either in the trial court or here, I conclude that the admission of that evidence and the court's consideration of it as corroborative evidence do not provide a basis for reversal.

Finally, because, as discussed below, I believe the court's contempt order was sufficiently supported by evidence unrelated to the juror deliberations, I conclude that the court's reception and consideration of such

evidence at a bench trial did not so undermine the fundamental fairness of the trial itself as to cast serious doubt upon the reliability of the court's order. *See Wilson v. People, supra.* Thus, in my view, there was no plain error.

## II.

As noted above, even if I were to assume that the trial court should not have considered the evidence of what occurred in juror deliberations in the underlying case, in my view the other evidence presented at trial sufficiently supports the trial court's contempt order.

In considering a challenge to the sufficiency of the evidence to support a conviction, we must review the evidence and all reasonable inferences which could be drawn from that evidence in the light most favorable to the prosecution. *People v. Rodriguez*, 914 P.2d 230 (Colo.1996).

An assertion that the evidence is insufficient will not result in reversal of a judgment by a trial court sitting as trier of fact where there is competent evidence in the record to support that court's findings of fact. *People v. Storey*, 191 Colo. 546, 554 P.2d 694 (1976).

We must give deference to the trial court's findings and may not overturn them provided they have record support. "This is true even though a contrary position may find support in the record and even though we might have reached a different result had we been acting as the trier of fact." *People v. Thomas*, 853 P.2d 1147, 1149 (Colo.1993).

Further, the determination of the credibility of the witnesses is solely within the province of the factfinder. *Kogan v. People*, 756 P.2d 945 (Colo.1988); *People v. Drake*, 841 P.2d 364 (Colo.App.1992).

Pursuant to C.R.C.P. 107, the definition of "contempt" includes "conduct that obstructs the administration of justice."

In *Clark v. United States, supra*, the Supreme Court recognized that concealment or misstatement by a juror upon voir dire examination can constitute contempt if its tendency and design are to obstruct the administration of justice. *See also In re Mossie*, 768

F.2d 985 (8th Cir.1985); *In re Brogdon,* 625 F.Supp. 422 (W.D.Ark.1985); *United States v. Lampkin,* 66 F.Supp. 821 (S.D.Fla.1946); *Witherspoon v. Arkansas,* 322 Ark. 376, 909 S.W.2d 314 (1995).

As Justice Cardozo pointed out in *Clark v. United States, supra,* 289 U.S. at 11, 53 S.Ct. at 468, 77 L.Ed. at 998, a prospective juror whose answers are willfully evasive or knowingly untrue is, when accepted, a juror in name only, whose relation to the court "is tainted in its origin" and is "a mere pretense and sham."

As our own supreme court has recognized, where a juror conceals or misstates important biographical information relevant to a challenge for cause or a peremptory challenge, "the juror's deliberate misrepresentation or knowing concealment is itself evidence that the juror was likely incapable of rendering a fair and impartial verdict on the matter." *People v. Dunoyair,* 660 P.2d 890, 895 (Colo.1983).

A juror who thus misrepresents or conceals relevant information is guilty of misconduct which may be prejudicial to either or both parties because it impairs the right to challenge for cause or peremptorily. *People v. Rael,* 40 Colo.App. 374, 578 P.2d 1067 (1978).

Here, the trial court made the following findings of fact, among others, with respect to Kriho's conduct or omissions as a prospective juror in the trial of the underlying criminal case:

> Several times during voir dire the judge, [the prosecutor], and [defense counsel] discussed issues related to drugs with several different jurors. This Court finds that Ms. Kriho was aware that any experiences, or strong opinions she had concerning the drug laws were important issues in selecting the jury. The evidence shows that on 1983, in Boulder County District Court, Ms. Kriho had pled guilty to the felony crime of Possession of a Schedule I controlled substance and was granted a deferred judgment and sentence. The evidence further shows that Ms. Kriho holds strong opinions about the propriety of certain drug laws. She is a founder and activist in an organization called the Boul-

der Hemp Initiative Project, which has the goal of legalizing marijuana in Colorado. She failed to reveal any of this highly relevant information during the jury selection process.

The court went on to conclude that Kriho had deliberately withheld the pertinent information from the trial court and the parties during the jury selection process and had done so in order that she could be selected to serve on the jury and obstruct the judicial process. In addition, the court concluded that, by deliberately withholding the information, Kriho had in fact obstructed the process of selecting a fair and impartial jury.

Viewed in the light most favorable to the prosecution, the evidence unrelated to deliberations adequately supports the trial court's findings and its contempt order. It was within the trial court's province to find, based on such evidence, that Kriho deliberately concealed both the pertinent fact that she had been accused of and received a deferred judgment for unlawful possession of drugs, and the fact that she harbored strong views regarding certain of the drug laws. From that evidence, and permissible inferences that can be drawn from it, the court could also conclude that she had concealed such information for the purpose of getting on the jury and obstructing justice.

### III.

Rather than targeting either the admission of the evidence of juror deliberations or the sufficiency of the other evidence to sustain the contempt finding, Kriho's actual contention on appeal is that: "A juror cannot be charged with criminal contempt of court, and convicted, for actions taking place within the jury room, actions which comprise jury deliberations."

In other words, Kriho is urging that she was improperly convicted for her conduct in deliberations. As discussed above, however, the evidence that she intentionally concealed pertinent information regarding her previous drug charge and deferred judgment was not derived in any way from the juror-witnesses' testimony about deliberations. Similarly, the court's findings concerning Kriho's conceal-

ment of her views about drug laws are supported by the evidence unrelated to the deliberations.

The trial court in its findings emphasized that Kriho was not being sanctioned for her vote in deciding the underlying case but rather for deliberately misleading the court and counsel during jury selection with the intent to obstruct the legal process.

The court stated in its order:

> This case is not now and never has been about how Ms. Kriho voted during jury deliberations. This case is about whether Ms. Kriho misled the trial court and the trial attorneys about important matters during the trial selection process with the intent to remain on the jury and obstruct the legal process. The Court admitted evidence of Ms. Kriho's conduct during jury deliberations only as it was relevant to the issue of Ms. Kriho's conduct during the jury selection process.

In my view, the following observation by the Supreme Court in *Clark v. United States, supra*, 289 U.S. at 17–18, 53 S.Ct. at 470, 77 L.Ed. at 1001–02, applies with equal force to Kriho here:

> She has been held to answer for the deceit whereby she made herself a juror, and was thereby placed in a position to vote upon the case at all. What was said and done in the jury room is no more than confirmatory evidence of her state of mind before.

In *Clark*, the Court concluded that the juror would have been found in contempt even in the absence of any evidence concerning the jury deliberations, based on the showing that she had concealed pertinent information during voir dire. Essentially, the Court concluded that even if it were assumed that the evidence concerning deliberations should not have been allowed, its admission would have been harmless error. In my view, the same analysis would apply here if the harmless error standard were applicable.

While Kriho could not be punished for her statements in deliberations or for how she voted as a juror, she could be found in contempt—as she was—for obstruction of justice stemming from her deliberate failure to disclose critically pertinent information on voir dire.

Accordingly, I would affirm the trial court's contempt order.