The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Paul B. DUNOYAIR, Defendant-Appellant.

No. 81SA516.

Supreme Court of Colorado, En Banc.

March 14, 1983.

---

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Susan P. Mele-Sernovitz, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Bruce W. Warren, Niwot, for defendant-appellant.

QUINN, Justice.

The defendant, Paul Dunoyair, appeals his conviction of felony criminal mischief. He challenges the constitutionality of the criminal mischief statute, the sufficiency of the evidence to support his conviction, and the trial court's failure to order a new trial due to a juror's inadvertent nondisclosure during voir dire of his familiarity with a prosecution witness. Finding no error, we affirm.[1]

I.

The defendant was charged in the Boulder District Court with criminal mischief by knowingly damaging the personal property of the University of Colorado, the aggregate damage being $100 or more, on August 8, 1980. Section 18–4–501, C.R.S.1973 (1978 Repl.Vol. 8). Prior to trial the defendant moved to dismiss the information on the ground that the criminal mischief statute unconstitutionally imposed a greater penalty for the same or less serious conduct than that authorized by the theft statute. The court denied the motion to dismiss.

Trial commenced to a jury on December 11, 1980. The evidence established that on August 8, 1980, at about 6:30 p.m., the defendant, who was then present at the Alferd Packer Grill at the University Memorial Center on the Boulder campus, deliberately damaged a large canvas painting of

1. The defendant's appeal was transferred to this court because of his constitutional challenge to the criminal mischief statute. *See* sections 13–4–102(1)(b) and 13–4–110(1)(a), C.R.S.1973.

Packer which hung on the wall of the grill.[2] The defendant used an ashtray to poke a hole into the canvas, inflicted two massive tears on the painting, and then crumpled the canvas and threw it to the floor. The incident was witnessed by several persons and was reported to a security guard. The guard went to the grill and detained the defendant for the university police.

The painting was owned by the University of Colorado and had been commissioned for $400 in March 1977 by Art Ingraham, the University Food Service Director. The painting at the time of the incident, according to Mr. Ingraham, was in perfect condition. It was restored by Jalal Quinn, the art director at the University Memorial Center, at a cost of $212. This restoration cost was below the normal cost of restoration because Ms. Quinn was able to purchase various materials from the campus book store at a price considerably below the retail cost. The art director testified that the painting had sustained considerable damage, including massive tears and cracks, and that the replacement cost of the painting was between $800 and $1000.

The defendant testified on his own behalf. He stated that on the date of the offense he was neither a student nor an employee of the university. He went to the grill and ordered a meal. After observing the painting he decided to tear it down because he considered it "obsessively large and distasteful and anti-social."

At the conclusion of the evidence the court submitted to the jury the charge of felony criminal mischief involving damage of $100 or more and the lesser offense of criminal mischief involving damage of less than $100. The court instructed the jury that the amount of damage should be determined by considering "the reasonable cost of repairing the property, unless the cost of repair exceeds the market value of the property before the damage occurred," in which event the amount of damage must not exceed the market value. The jury returned a guilty verdict of felony criminal mischief.

The defendant filed a motion for a new trial. The motion alleged that after the trial one of the jurors informed defense counsel that he knew a prosecution witness,

2. Packer was indicted for five separate counts of murder allegedly committed in 1874 in Hinsdale County, Colorado. He was tried, convicted and sentenced to death on one of the murder charges, but his conviction was reversed on the ground that the criminal code prescribing the punishment for murder was repealed by the legislature without a saving clause after Packer had dispatched his victims but before his conviction. *Packer v. People,* 8 Colo. 361, 8 P. 564 (1885). Thereafter, Packer was retried and convicted of five counts of manslaughter and sentenced to a term of 40 years. *Packer v. People,* 26 Colo. 306, 57 P. 1087 (1889).

The reason the student grill bears Packer's name becomes quite obvious when the facts underlying his conviction are examined. In the fall of 1873 Packer agreed to lead a party of five gold seekers—Bell, Humphreys, Swan, Miller and Moon—across the San Juan Range and into New Mexico. Huge snowdrifts delayed the party's journey and they made camp near Powderhorn Creek in January 1874. Rations dwindled and a few months later Packer came out of the mountains alone, settling at Saguache, Colorado. The relatives of the missing men put pressure on the town marshal of Saguache to investigate their disappearance. The marshal organized a posse and found the bodies of the five men, neatly butchered, on the bank of Powderhorn Creek. Upon being con-

fronted with this evidence, Packer told the marshal the following story, as recounted in D. McLoughlin, *Wild & Woolly: An Encyclopedia of the Old West* 394 (1975).

"On returning to camp after a luckless search for game, Packer had found Bell dropping pieces of odd-looking meat into the stewpot, and before Packer had time to ask where the victuals had come from, Bell had attacked him with a blood-stained ax—well, like, Packer had killed Bell in self-defense, and it was only then that he had noticed the bodies of Humphreys, Swan, Miller, and Moon, and the fact that the latter had been shorn of some of his flesh. To a man with an empty belly, the mess in that stewpot had smelled powerful nourishing; 'It tasted pretty good too iffen yer didn't dwell on what yer were chewin'.' The marshal nearly threw up as Packer explained how he had lived off the remains until spring thaws had allowed him to leave the mountains, and of how he had robbed the dead as 'they had no use fer the money.'"

After his arrest in 1874 Packer escaped and was not brought to trial until 1883, and he was ultimately sentenced for manslaughter in 1886. Packer was released from prison in 1910, at the age of fifty-two, and died in 1915.

Richard Bourie, who was the security guard at the campus center and testified about his detention of the defendant until the university police arrived. It was also alleged that the juror failed to disclose this fact when the jury panel was asked during jury selection whether they knew any of the prosecution witnesses. The defendant's motion was supported by an affidavit of the juror which stated:

"I realized during the trial that I was acquainted with a witness for the prosecution, Richard Bourie, when I saw Mr. Bourie in the Courtroom.

"I did not recognize Mr. Bourie's name when the list of prospective witnesses was read during voir dire, and did not indicate that I was acquainted with him.

"I became acquainted with Mr. Bourie several years ago while I was a student at the University of Colorado, working on a work-study program at the Veteran's Club offices. Mr. Bourie was a member of the Veteran's Club at that time."

The defendant offered no evidence that the juror's acquaintance with the witness affected in any manner the juror's ability to decide the case in accordance with the evidence and the law. The court denied the motion for a new trial and this appeal followed.

We consider first the defendant's constitutional challenge to the criminal mischief statute, next the claimed insufficiency of the evidence to support his conviction, and last the trial court's denial of a new trial notwithstanding the juror's nondisclosure of his acquaintance with one of the prosecution witnesses.

## II.

The defendant argues that the criminal mischief statute violates equal protection of the laws because on the date of the offense it authorized a disproportionately greater penalty for what the defendant asserts is the same conduct proscribed by the theft statute. We find no merit in his argument.

Equal protection of the laws under the Colorado Constitution is violated when criminal statutes proscribe identical conduct but impose different criminal sanctions for that conduct.[3] E.g., People v. Taggart, 621 P.2d 1375 (Colo.1981); People v. Burns, 197 Colo. 284, 593 P.2d 351 (1979); People v. Marshall, 196 Colo. 381, 586 P.2d 41 (1978); People v. Czajkowski, 193 Colo. 352, 568 P.2d 23 (1977). On August 8, 1980, the date of the offense, section 18–4–501, C.R.S.1973 (1978 Repl.Vol. 8), defined the crime of criminal mischief as follows:

"Any person who knowingly damages the real or personal property of one or more other persons in the course of a single criminal episode commits a class 2 misdemeanor where the aggregate damage to the real or personal property is less than one hundred dollars. Where the aggregate damage to the real or personal property is one hundred dollars or more, he commits a class 4 felony."[4]

3. The constitutional guarantee of equal protection of the laws is included within the Due Process Clause of the Colorado Constitution, Art. II, Sec. 25. E.g., Heninger v. Charnes, 200 Colo. 194, 613 P.2d 884 (1980). Because the Colorado equal protection guarantee affords protection against statutory classifications that proscribe identical conduct with different penalties, see, e.g., People v. Marcy, 628 P.2d 69 (Colo.1981), while the federal equal protection guarantee has not yet been so applied, see United States v. Batchelder, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), we limit our discussion to the defendant's state equal protection claim. The defendant has not cited any federal authority in support of his federal equal protection claim, and we find it to be lacking in merit.

4. The criminal mischief statute was amended in 1981, section 18–4–501, C.R.S.1973 (1982 Supp.), to provide as follows:

"Any person who knowingly damages the real or personal property of one or more other persons in the course of a single criminal episode commits a class 3 misdemeanor where the aggregate damage to the real or personal property is less than fifty dollars. Where the aggregate damage to the real or personal property is fifty dollars or more but less than two hundred dollars, he commits a class 2 misdemeanor. Where the aggregate damage to the real or personal property is two hundred dollars or more but less than ten thousand dollars, he commits a class 4 felony. Where the aggregate damage to the real or personal property is ten thousand dollars or more, he commits a class 3 felony."

A class 4 felony was and is punishable by a presumptive sentence of two to four years, plus one year of parole. Section 18–1–105(1)(a), C.R.S.1973 (1982 Supp.). The crime of theft is committed when a person knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and either intends to permanently deprive or disposes of the property in such a manner as to permanently deprive the other person of the use or benefit of the property. Section 18–4–401(1), C.R.S.1973 (1978 Repl.Vol. 8).[5] Theft of property valued from $50 to $200 is a class 2 misdemeanor, section 18–4–401(2)(b), C.R.S.1973 (1978 Repl.Vol. 8), punishable by three to twelve months imprisonment, a fine of $250 to $1000, or both, section 18–1–106, C.R.S.1973 (1982 Supp.), and a class 4 felony if the value of the thing taken was $200 or more but less than $10,000, section 18–4–401(2)(c), C.R.S.1973 (1978 Repl.Vol. 8).

■ The criminal mischief statute, in our view, addresses conduct that is separate and distinct from theft. The gravamen of criminal mischief is the knowing causation of damage to another's property with resulting economic loss to the owner or possessor of the property. The crime of theft, in contrast, is a crime of misappropriation or wrongful taking with no added element of damage or destruction to the property taken. These differences between the two offenses are real and substantial. The legislature acted within its discretion in determining that the conduct encompassed by criminal mischief was sufficiently serious in character to justify a line of demarcation at $100 or more for the felony grade of this offense. That the legislature also chose a line of demarcation at $200 or more for the felony classification of theft is of no constitutional significance in view of the substan-

tial differences in the conduct proscribed by the different statutes.[6] The challenged legislative classification, therefore, does not violate equal protection of the laws.[7]

## III.

■ The defendant argues that his conviction for felony criminal mischief cannot stand because the prosecution failed to carry its burden of establishing the market value of the undamaged painting at $100 or more. The defendant's argument is based upon the unsupported assumption that there was no evidence of the painting's value on the date of the offense. The evidence, however, established that the painting was purchased in March 1977 for $400 and was in perfect condition on the date of the crime. We are not dealing here with a mechanical object that substantially depreciated in market value during a three to four year period of time. *See People v. Paris,* 182 Colo. 148, 511 P.2d 893 (1973); *Noble v. People,* 173 Colo. 333, 478 P.2d 662 (1970). Rather, in the period of three and one-half years from the purchase of the painting to the date of the offense, there is nothing to suggest that the painting depreciated in value at all. Moreover, Jalal Quinn, the art director who restored the painting, testified without objection that in her opinion the cost of replacement would be $800 to $1000. There was thus sufficient evidence to establish the actual value of the painting on the date of the crime at $100 or more.

■ We recognize that the damage element in criminal mischief relates to economic loss caused by the knowing infliction of damage to the real or personal property of another. Value is relevant to the damage element because an offender cannot cause an economic loss that surpasses the

---

5. The elements and penalties for theft are the same today as they were on August 8, 1980, the date of the offense in this case.

6. That the legislature later amended the criminal mischief statute to create classifications and penalties similar to those applicable to theft *is of no significance to the defendant's* constitutional claim.

7. The defendant also claims that the criminal mischief statute violates due process of law, but has failed to provide us with any legal argument on this issue. We reject the defendant's due process claim.

actual value of the property damaged. Thus, where the cost of repair or restoration exceeds the actual value of an object, the victim's economic loss will be limited to the actual value of the object. *See People v. Cisneros,* 193 Colo. 380, 566 P.2d 703 (1977). Actual value will generally be determined by market value, that is, the price a willing buyer would pay for the object in the open market. *People v. Marques,* 184 Colo. 262, 520 P.2d 113 (1974); *People v. Paris, supra.* Where, however, there is no market for the particular item, then such factors as the original purchase price, replacement cost, the general use and purpose of the article, and salvage value may be considered as some evidence of actual value. *Burns v. People,* 148 Colo. 245, 251, 365 P.2d 698, 701 (1961). In cases of partial damage, the appropriate measure of economic loss will generally be the reasonable cost of repair or restoration. *People v. Waters,* 641 P.2d 292 (Colo.App.1981).

In this case the evidence established that the market value of the painting was substantially in excess of the amount of damage caused by the defendant. The defendant's criminal liability, therefore, was determined on the basis of the victim's economic loss measured by the reasonable cost of repair or restoration. The jury verdict, viewed in the context of the court's instruction on damage, indicates that the jury was convinced beyond a reasonable doubt that the market value of the painting was more than $100 on the date of the offense and that the damage to the painting was not only less than the market value of the property but also amounted to $100 or more.

## IV.

The defendant's final argument is that he was denied a fair trial by reason of a juror's failure during voir dire to disclose his acquaintance with one of the prosecution witnesses. Under some circumstances a juror's nondisclosure of information during jury selection may be grounds for a new trial. Where, for example, a juror deliber-

ately misrepresents important biographical information relevant to a challenge for cause or a peremptory challenge or knowingly conceals a bias or hostility towards the defendant, a new trial might well be necessary. *See People v. Borrelli,* 624 P.2d 900 (Colo.App.1980); *People v. Rael,* 40 Colo.App. 374, 578 P.2d 1067 (1978). In such instances the juror's deliberate misrepresentation or knowing concealment is itself evidence that the juror was likely incapable of rendering a fair and impartial verdict in the matter. In this case, however, the juror's nondisclosure of the information was inadvertent, and the undisclosed information pertained to a prosecution witness whose testimony was of only peripheral significance to the charge. Under these circumstances we cannot say that a merely inadvertent nondisclosure is presumptively prejudicial and sufficient by itself to warrant a new trial. *See, e.g., United States v. Moss,* 591 F.2d 428 (8th Cir.1979) (juror's inadvertent nondisclosure of acquaintance with defense counsel, who previously represented adversary of juror's wife in prior litigation, not a basis for new trial); *Moynahan v. State,* 31 Conn.Supp. 434, 334 A.2d 242 (1974) (juror's failure to disclose, through forgetfulness, a prior attorney-client relationship with prosecutor ten years prior to trial not sufficient to justify a new trial); *Commonwealth v. Mascolo,* 6 Mass. App.Ct. 266, 375 N.E.2d 17 (1978), *cert. denied,* 439 U.S. 899, 99 S.Ct. 265, 58 L.Ed.2d 247 (1978) (juror's nondisclosure through inadvertence of prior acquaintance with prosecutor and defense counsel insufficient to justify a new trial).

The jury selection process cannot uncover every possible influence that might theoretically affect a juror's consideration of a case. One of the purposes of written instructions of law is to offset possibly inappropriate considerations that might arise during the course of a trial by emphasizing the importance of fairness in the deliberative process.[8] There is no reason to pre-

---

**8.** The jury, for example, received written instructions on the presumption of innocence, the

burden of proof, the definition of reasonable doubt, the elements of the offense, and was

sume that a juror's sudden realization during trial that he is acquainted with a prosecution witness will so impair the juror's ability to follow the court's instructions as to undermine the juror's impartiality in the deliberative process. *See generally Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Such a presumption would be particularly inappropriate where, as here, the witness's testimony relates to facts which are tangential to the alleged criminal act and were never disputed by the defendant. In the absence of a showing by the defendant that the juror's prior acquaintance with the witness was such as to create an actual bias either in favor of the prosecution or against the defendant, and no such showing has been made here, we will assume that the juror followed the instructions of the court and decided the case solely on the basis of the evidence and the law.

The judgment is affirmed.

also instructed: "It is your duty to determine the facts, and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case."

Further, the jury was instructed that neither sympathy nor prejudice should influence its deliberations.