2015 CO 31

**Miguel Angel PENA–RODRIGUEZ, Petitioner**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

**Supreme Court Case No. 13SC9**

Supreme Court of Colorado.

May 18, 2015

Rehearing Denied June 15, 2015

Attorneys for Petitioner: The Law Office of Jonathan D. Rosen, PC, Jonathan D. Rosen, Denver, Colorado.

Attorneys for Respondent: Cynthia H. Coffman, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado.

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶ 1 This case involves the interplay between two fundamental tenets of the justice system: protecting the secrecy of jury deliberations and ensuring a defendant's constitutional right to an impartial jury. After entry of a guilty verdict, defense counsel obtained juror affidavits suggesting that one of the jurors exhibited racial bias against the defendant during deliberations. The trial court refused to consider these affidavits, finding that Colorado Rule of Evidence ("CRE") 606(b) barred their admission, and the court of appeals affirmed. *People v. Pena–Rodriguez*, 2012 COA 193, ¶ 3, 2012 WL 5457362, —— P.3d ——. We granted certiorari to consider whether CRE 606(b) applies to such affidavits and, if so, whether the Sixth Amendment nevertheless requires their admission.[1]

¶ 2 We hold that the affidavits regarding the juror's biased statements fall within the broad sweep of CRE 606(b) and that they do not satisfy the rule's "extraneous prejudicial information" exception. We further hold that the trial court's application of CRE 606(b) did not violate the defendant's Sixth Amendment right to an impartial jury. Accordingly, we affirm the judgment of the court of appeals.

---

1. Specifically, we granted certiorari to consider: "Whether C.R.E. 606(b) bars the admission of juror statements showing evidence of racial bias made during jury deliberations, and if so, whether the defendant's constitutional right to a fair trial nevertheless requires such statements' admission."

## I. Facts and Procedural History

¶ 3 In May 2007, a man made sexual advances toward two teenage girls in the bathroom of the horse-racing facility where Petitioner Miguel Angel Pena–Rodriguez worked. Shortly thereafter, the girls identified Petitioner as the assailant during a one-on-one showup. The People subsequently charged Petitioner with one count of sexual assault on a child—victim less than fifteen; one count of unlawful sexual contact—no consent; and two counts of harassment—strike, shove, or kick. After a preliminary hearing, the court bound over the first count as attempted sexual assault on a child—victim less than fifteen.[2]

¶ 4 At the start of a three-day trial, the jury venire received a written questionnaire, which inquired, "Is there anything about you that you feel would make it difficult for you to be a fair juror in this case?" During voir dire, the judge asked the panel, "Do any of you have a feeling for or against [Petitioner] or the Prosecution?" Later, defense counsel asked the venire whether "this is simply not a good case for them to be a fair juror." None of the jurors subsequently impaneled answered any of these questions so as to reflect racial bias. The jury ultimately found Petitioner guilty of the latter three counts but failed to reach a verdict on the attempted sexual assault charge.

¶ 5 Two weeks later, Petitioner filed a motion for juror contact information, alleging that "some members of the jury used ethnic slurs in the course of deliberations." The trial court ordered Petitioner to submit affidavits regarding the " 'who, what, when, and where' of the allegations of juror misconduct." Petitioner's counsel subsequently filed an affidavit averring that, shortly after entry of the verdict, two jurors informed her that "some of the other jurors expressed a bias toward [Petitioner] and the alibi witness because they were Hispanic."[3] The trial

---

2. The People also charged Petitioner with driving under the influence, but they voluntarily dismissed that charge prior to trial.

3. Petitioner's friend, M. Chavez, testified that Petitioner was with him at the time of the incident and thus could not have been the man in the bathroom.

court then authorized Petitioner's counsel to contact these jurors, but only to secure affidavits regarding their "best recollection of exactly what each 'biased' juror stated about [Petitioner] and/or the alibi witness."

¶ 6 Thereafter, Petitioner submitted affidavits from jurors M.M. and L.T., both of whom alleged that juror H.C. made racially biased statements during deliberations. According to M.M., H.C. said that "I think he did it because he's Mexican and Mexican men take whatever they want." She also stated that H.C. "made other statements concerning Mexican men being physically controlling of women because they have a sense of entitlement and think they can 'do whatever they want' with women." L.T. stated that H.C. "believed that [Petitioner] was guilty because in his experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." L.T. further averred that H.C. "said that where he used to patrol, nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." Finally, L.T. stated that H.C. "said that he did not think the alibi witness was credible because, among other things, he was 'an illegal.' " Based on these affidavits, Petitioner moved for a new trial. The trial court denied the motion, finding that CRE 606(b) barred any inquiry into H.C.'s alleged bias during deliberations.[4]

¶ 7 Petitioner appealed, and a split division of the court of appeals affirmed. *Pena–Rodriguez*, ¶ 3. The majority first held that CRE 606(b) controlled the admissibility of the jurors' affidavits and that the affidavits did not satisfy the rule's exceptions. *Id.* at ¶¶ 33, 38, 41–42. The majority then rejected Petitioner's constitutional challenge regarding his Sixth Amendment right to an impartial jury, holding that Petitioner "waived his ability to challenge the verdict on this basis by failing to sufficiently question jurors about racial bias in voir dire." *Id.* at ¶ 43. Writing in dissent, Judge Taubman did not disagree with the majority's general analysis of CRE 606(b). *Id.* at ¶ 107 n.3. He con-

cluded, however, that CRE 606(b) was unconstitutional as applied. *Id.* at ¶ 107. We granted certiorari.

## II. Standard of Review

■■■ ¶ 8 The general applicability of CRE 606(b) is a question of law that we review de novo. *See Kendrick v. Pippin,* 252 P.3d 1052, 1064 (Colo.2011), *abrogated on other grounds by Bedor v. Johnson,* 2013 CO 4, 292 P.3d 924. But whether the jury was influenced by extraneous prejudicial information is a mixed question of law and fact; we accept the trial court's findings of fact absent an abuse of discretion, but we review the court's legal conclusions de novo. *Id.*

## III. Analysis

¶ 9 This case requires us to resolve whether CRE 606(b) bars admission of juror affidavits suggesting that a juror made racially biased statements during deliberations. To do so, we first examine the plain language of the rule and its overarching purpose. We then conclude that such affidavits indeed implicate CRE 606(b) and do not fall within the rule's "extraneous prejudicial information" exception. Finally, we consider whether the rule was unconstitutional as applied to Petitioner, and we determine that enforcing the rule did not violate his Sixth Amendment right to an impartial jury.

## A. CRE 606(b): Language and Purpose

¶ 10 CRE 606(b) is broad in scope: It precludes courts from peering beyond the veil that shrouds jury deliberations. Specifically, the rule provides as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.

---

4. The trial court did conduct a brief hearing to investigate whether H.C. deliberately misrepresented his experience in law enforcement during voir dire; it found his failure to disclose this information to be inadvertent. This issue is irrelevant to this appeal.

CRE 606(b). The rule does, however, enumerate three narrow exceptions: "[A] juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." *Id.* Colorado's rule is virtually identical to its federal counterpart. *Compare id. with* Fed. R. Evid. 606(b). *See also* CRE 606(b) committee cmt. ("[CRE] 606(b) has been amended to bring it into conformity with the 2006 amendments to the federal rule . . . .").

¶ 11 CRE 606(b) effectuates three fundamental purposes: It "promote[s] finality of verdicts, shield[s] verdicts from impeachment, and protect[s] jurors from harassment and coercion." *People v. Harlan,* 109 P.3d 616, 624 (Colo.2005). Thus, the rule "strongly disfavors any juror testimony impeaching a verdict." *Id.* We have recognized that the federal rule is equally forbidding. *See Stewart ex rel. Stewart v. Rice,* 47 P.3d 316, 321 (Colo.2002) ("[Fed. R. Evid. 606(b)] would have been hard to paint with a broader brush, and in terms of subject, [its] exclusionary principle reaches everything which relates to the jury's deliberations, unless one of the exceptions applies." (quoting Christopher B. Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b),* 57 Neb. L.Rev. 920, 935 (1978))).

¶ 12 With the proscriptive language and purpose of CRE 606(b) in mind, we now consider whether the rule operates to bar admission of the juror affidavits in this case.

**B. CRE 606(b) Bars Admission of the Jurors' Affidavits**

¶ 13 CRE 606(b)'s plain language clearly bars admission of the jurors' affidavits in this case. Absent narrow exceptions, the rule unambiguously prohibits juror testimony "as to any matter or statement occurring during the course of the jury's deliberations." Here, Petitioner seeks to introduce juror testimony precisely to that effect, as the affidavits from both M.M. and L.T. pertain to statements made during deliberations.

Therefore, CRE 606(b) precludes their admission.

¶ 14 Petitioner argues that the affidavits do not involve "an inquiry into the validity of [the] verdict" as contemplated by CRE 606(b). In Petitioner's view, the rule only applies to statements regarding the jury's actual deliberative process—that is, *how* the jury reached its verdict—and not to evidence of a particular juror's racial bias. To the extent that we can even parse this semantic distinction, we deem it immaterial. Petitioner seeks to introduce evidence of comments made during deliberations in order to nullify the verdict and obtain a new trial. Such a request necessarily involves an inquiry into the verdict's validity, which is the very inquiry that CRE 606(b) prevents.

¶ 15 Indeed, the U.S. Supreme Court expressly rejected this exact argument in *Warger v. Shauers,* —— U.S. ——, 135 S.Ct. 521, 528, 190 L.Ed.2d 422 (2014), determining that the rule "does not focus on the means by which deliberations evidence might be used to invalidate a verdict." Rather, the Court held that the rule "simply applies '[d]uring an inquiry into the validity of the verdict'—that is, during a *proceeding* in which the verdict may be rendered invalid." *Id.* (alteration in original). Although the Court was interpreting Fed. R. Evid. 606(b), we have previously recognized that CRE 606(b) is "[s]ubstantially similar to its federal counterpart" and that we "look to the federal authority for guidance in construing our rule." *Stewart,* 47 P.3d at 321. Thus, *Warger* forecloses Petitioner's argument.

¶ 16 Petitioner next contends that, even if CRE 606(b) applies, the affidavits satisfy the rule's exception for "extraneous prejudicial information." He is mistaken. That exception pertains to "legal content and specific factual information learned from outside the record and relevant to the issues in a case." *Kendrick,* 252 P.3d at 1064; *see, e.g., Harlan,* 109 P.3d at 629 (holding that two jurors' introductions of annotated Bibles into deliberations during a death penalty case constituted extraneous information because "[t]he trial court had not admitted these materials into evidence, nor did the court's in-

structions allow their use"). But it is "generally undisputed" that jurors "may apply their general knowledge and everyday experience when deciding cases." *Kendrick*, 252 P.3d at 1064; *accord Warger*, —— U.S. at ——, 135 S.Ct. at 529 ("Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury. 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room."). Here, H.C. did not perform any improper investigation into Petitioner's case, nor did he introduce evidence from outside the record into the jury room. Rather, his alleged racial bias arose from his personal beliefs and everyday experience. Such bias, however ideologically loathsome, is not "extraneous" as contemplated by CRE 606(b).

¶ 17 And once again, *Warger* scuttles Petitioner's claim. In that car-crash case, following a verdict for the defendant, a juror reported that another juror stated during deliberations that her daughter had once caused a motor vehicle accident and that "if her daughter had been sued, it would have ruined her life." —— U.S. at ——, 135 S.Ct. at 524. The Court held that such information "falls on the 'internal' side of the line: [The juror's] daughter's accident may well have informed her general views about negligence liability for car crashes, but it did not provide either her or the rest of the jury with any specific knowledge regarding [the] collision." *Id.* at ——, 135 S.Ct. at 529. The Court noted that even if the juror's comments would have warranted a challenge for cause, that did not render them "extraneous," as otherwise "[t]he 'extraneous' information exception would swallow much of the

rest of Rule 606(b)." *Id.* at ——, 135 S.Ct. at 530. The same analysis applies here.

¶ 18 Accordingly, we hold that the affidavits concerning H.C.'s biased statements fall within the broad sweep of CRE 606(b) and that they do not satisfy the rule's "extraneous prejudicial information" exception. We now address whether CRE 606(b) was unconstitutional as applied in this case.[5]

## C. CRE 606(b) Was Not Unconstitutional as Applied

■ ¶ 19 The Sixth Amendment to the U.S. Constitution provides that "the accused shall enjoy the right to ... an impartial jury." The question here is whether the trial court's application of CRE 606(b), which functioned to bar evidence of H.C.'s alleged racial bias against Petitioner, violated his Sixth Amendment right.

¶ 20 The U.S. Supreme Court addressed a similar—though not identical—issue in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). In that case, following the verdict, a juror contacted defense counsel and informed him that several jurors had consumed alcohol on lunch breaks during the trial and had slept through afternoons, while another juror told counsel that the jury was "one big party" and that numerous jurors used alcohol and drugs. *Id.* at 113, 115–16, 107 S.Ct. 2739. After holding that Fed. R. Evid. 606(b) barred this testimony, *see id.* at 125, 107 S.Ct. 2739, the Court considered whether the Sixth Amendment nevertheless required the trial court to examine such evidence. The Court first declared that "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry."

---

5. The court of appeals refused to conduct this analysis, holding that Petitioner "waived his ability to challenge the verdict on this basis by failing to sufficiently question jurors about racial bias in voir dire." *Pena–Rodriguez*, ¶ 43. But a defense attorney's decision *not* to ask about racial bias—and to instead attempt to root out prejudice through generalized questioning—is entirely defensible as a matter of strategy. *See United States v. Villar*, 586 F.3d 76, 87 n.5 (1st Cir.2009) ("[M]any defense attorneys have sound tactical reasons for not proposing specific voir dire questions regarding racial or ethnic bias because it might be viewed as insulting to jurors or as raising an issue defense counsel does not want to highlight."). Here, Petitioner's counsel asked potential jurors not whether they took issue with Petitioner's race but simply if they could be fair. We cannot conclude that this tactical decision to avoid explicitly inquiring about racial bias—which would have underscored Petitioner's minority background—constituted an affirmative waiver of Petitioner's constitutional right to an impartial jury.

*Id.* at 127, 107 S.Ct. 2739. Turning to the opposing scale, the Court reasoned that "several aspects of the trial process" protect a defendant's Sixth Amendment right to an impartial jury. *Id.* The Court identified four specific safeguards: (1) voir dire; (2) the court and counsel's ability to observe the jury during trial; (3) jurors' opportunity to "report inappropriate juror behavior to the court *before* they render a verdict"; and (4) the opportunity to use non-juror evidence of misconduct to impeach the verdict following trial. *Id.* The Court thus concluded that Rule 606(b) need not yield to Sixth Amendment considerations. *See id.*

¶ 21 *Tanner,* then, held that Rule 606(b) was not unconstitutional as applied to cases of juror incompetence. Last year, the Court in *Warger* extended *Tanner* to cases of juror bias. Relying on *Tanner,* the Court recognized that "[e]ven if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." *Warger,* —— U.S. at ——, 135 S.Ct. at 529. Therefore, the Court held that *Tanner* foreclosed "any claim that Rule 606(b) is unconstitutional in circumstances such as these." *Id.*

¶ 22 Combined, *Tanner* and *Warger* stand for a simple but crucial principle: Protecting the secrecy of jury deliberations is of paramount importance in our justice system. *See Tanner,* 483 U.S. at 119, 107 S.Ct. 2739 ("Substantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict."); *Warger,* —— U.S. at ——, 135 S.Ct. at 528 ("Rule 606(b) was premised on the concerns that the use of deliberations evidence to challenge verdicts would represent a threat to both jurors and finality in those circumstances not covered by the Rule's express exceptions."). It was this principle that animated the Court's refusals to deem Rule 606(b) unconstitutional, despite concerns regarding juror impropriety. Indeed, although the *Tanner* Court acknowledged that "postverdict investigation into juror misconduct would in some instances lead to the invalida-

tion of verdicts reached after irresponsible or improper juror behavior," it warned that "[i]t is not at all clear … that the jury system could survive such efforts to perfect it." 483 U.S. at 120, 107 S.Ct. 2739. As the Court recognized, not only would authorizing post-verdict investigations of jurors "seriously disrupt the finality of the process," but the very potential for such investigations would shatter public confidence in the fundamental notion of trial by jury. *Id.* ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct."); *see also United States v. Benally,* 546 F.3d 1230, 1233 (10th Cir.2008) ("If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands."). In fact, the Court perceived such a slippery slope as far back as 100 years ago:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

¶ 23 Turning to the instant case, this case law compels the conclusion that CRE 606(b) was not unconstitutional as applied to Petitioner. A contrary holding would ignore both the policy underlying CRE 606(b) and the unwavering Supreme Court precedent emphasizing the magnitude of that policy. To be sure, neither *Tanner* nor *Warger* in-

volved the exact issue of racial bias. But in examining the Court's jurisprudence, we cannot discern a dividing line between different *types* of juror bias or misconduct, whereby one form of partiality would implicate a party's Sixth Amendment right while another would not. *Cf. Benally,* 546 F.3d at 1241 ("[O]nce it is held that the rules of evidence must be subordinated to the need to admit evidence of Sixth Amendment violations, we do not see how the courts could stop at the 'most serious' such violations."). To draw such a line would not only violate the long-standing rule of shielding private jury deliberations from public view—not to mention incentivize post-verdict harassment of jurors—but it would also require trial courts to make arbitrary judgments that hinge on the severity of a particular juror's impropriety or the intensity of his bias. We decline to sanction such a haphazard process.

¶ 24 Admittedly, bias is less readily visible than intoxication, meaning the second *Tanner* protection—the ability of the court to observe the jury's behavior during trial—carries less force in such cases. But that did not prevent the *Warger* Court from deeming the remaining *Tanner* safeguards sufficient to protect a party's constitutional rights, even when a biased juror lied during voir dire. *See Warger,* —— U.S. at ——, 135 S.Ct. at 529; *see also Benally,* 546 F.3d at 1240 ("The safeguards that the Court relied upon for exposing the drug and alcohol use amongst jurors in *Tanner* are also available to expose *racial biases* ...." (emphasis added)). The same is true here. Other jurors could have informed the court or counsel of H.C.'s statements prior to delivering the verdict, and any non-juror evidence of his bias remained admissible post-verdict. That these safeguards did not benefit Petitioner in this case does not nullify their validity, nor *Warger's* clear endorsement of their ability to protect a party's constitutional right to an impartial jury.[6]

¶ 25 Accordingly, we conclude that the trial court's application of CRE 606(b) to bar admission of the jurors' affidavits did not violate Petitioner's Sixth Amendment right.

## IV. Conclusion

¶ 26 CRE 606(b) operates to ensure that the privacy of jury deliberations remains sacrosanct. The rule, and the policy it buttresses, is squarely on point in this case. We thus hold that the jurors' affidavits regarding H.C.'s biased statements fall within the broad sweep of CRE 606(b) and that they do not satisfy the rule's "extraneous prejudicial information" exception. We further hold that the trial court's application of CRE 606(b) did not violate Petitioner's Sixth Amendment right to an impartial jury. Accordingly, we affirm the judgment of the court of appeals.

JUSTICE MÁRQUEZ dissents, and JUSTICE EID and JUSTICE HOOD join in the dissent.

JUSTICE MÁRQUEZ, dissenting.

¶ 27 I agree with the majority that CRE 606(b) bars admission of the post-verdict affidavits in this case. By its terms, that rule of evidence precludes any "inquiry into the validity of a verdict" based on juror testimony regarding statements made during jury deliberations, and Pena–Rodriguez's motion for a new trial "plainly entail[ed] an inquiry into the validity of the verdict," even if it questioned the jury's impartiality and not its thought processes. *Warger v. Shauers,* —— U.S. ——, 135 S.Ct. 521, 525, 190 L.Ed.2d 422 (2014) (internal quotation marks omitted). I also agree that evidence of a juror's personal bias does not qualify as "extraneous prejudicial information" for purposes of the exception in CRE 606(b)(1). *See id.* at ——, 135 S.Ct. at 529; *United States v. Benally,* 546 F.3d 1230, 1237–38 (10th Cir.2008); *Kendrick v. Pippin,* 252 P.3d 1052, 1064 (Colo.

6. We recognize that the *Warger* Court commented, in a footnote, that "[t]here may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." —— U.S. at —— n.3, 135 S.Ct. at 529 n.3. But the Court declined to consider in that case "whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Id.* Absent a clear command from the Supreme Court, we will not defy the unmistakable trend in the Court's case law—as articulated in both *Tanner* and *Warger*—preserving the sanctity of jury deliberations and thus refusing to deem Rule 606(b) unconstitutional.

2011). Nevertheless, I respectfully dissent because, in my view, Rule 606(b) "cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant's right to due process and an impartial jury." *United States v. Villar,* 586 F.3d 76, 87 (1st Cir.2009). Racial bias is detestable in any context, but in our criminal justice system it is especially pernicious. *See Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). I would hold that where, as here, evidence comes to light that a juror specifically relied on racial bias to find the defendant guilty, CRE 606(b) must yield to the defendant's constitutional right to an impartial jury.[1]

¶ 28 By foreclosing consideration of the evidence of racial bias alleged in this case, the majority elevates general policy interests in the finality of verdicts and in avoiding the potential embarrassment of a juror over the defendant's fundamental constitutional right to a fair trial. Although the majority believes that this result is required to preserve public confidence in our jury trial system, in my view, it has precisely the opposite effect.

¶ 29 "The right to an impartial jury is guaranteed by both the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and by principles of due process." *Turner v. Murray,* 476 U.S. 28, 36 n.9, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). Our state constitution likewise guarantees this right. *See* Colo. Const. art. II, §§ 16, 25. Indeed, this court has observed that "[a]n impartial jury is a fundamental element of the constitutional right to a fair trial." *Morrison v. People,* 19 P.3d 668, 672 (Colo.2000) (citing *People v. Rhodus,* 870 P.2d 470, 473 (Colo.1994)). Racial discrimination in our jury trial system "not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a repre-

sentative government." *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940) (footnote omitted). Importantly, the harm caused by such discrimination is " 'not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.' " *Rose,* 443 U.S. at 556, 99 S.Ct. 2993 (quoting *Ballard v. United States,* 329 U.S. 187, 195, 67 S.Ct. 261, 91 L.Ed. 181 (1946)).

¶ 30 In its recent discussion of Fed. R. Evid. 606(b) in *Warger,* the United States Supreme Court observed that certain features built into the jury system ordinarily suffice to expose juror bias before the jury renders a verdict. *Warger,* —— U.S. at ——, 135 S.Ct. at 529 (citing *Tanner v. United States,* 483 U.S. 107, 127, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987)).[2] *Warger* involved a negligence action arising out of a motor vehicle accident. *See id.* at ——, 135 S.Ct. at 524. In that case, a juror allegedly stated during deliberations that her daughter had been at fault in a motor vehicle collision in which a man died and that if her daughter had been sued, it would have ruined her life. *Id.* Warger argued in a motion for a new trial that this statement revealed that the juror had lied during voir dire about her impartiality and her ability to award damages. *Id.* The Court concluded that Fed. R. Evid. 606(b) barred consideration of this evidence. *Id.* at ——, 135 S.Ct. at 525. It also concluded that its decision in *Tanner* foreclosed Warger's claim that Rule 606(b) was unconstitutional as applied to the circumstances of that case. *Id.* at ——, 135 S.Ct. at 529. In so doing, however, the Court expressly acknowledged that "[t]here may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged," and declined to consider whether "the usual safeguards are or are not sufficient to protect the integrity of the [jury] process" under

---

1. I note that the question before us is not whether there is sufficient evidence to impeach the jury's verdict. Rather, the question is simply whether the trial court has discretion to consider the allegations made in the post-verdict affidavits and to explore the validity of those allegations in an evidentiary hearing as part of a motion for a new trial.

2. These protections include: (1) voir dire; (2) observations of the jury by the court, counsel, and court personnel during trial; (3) pre-verdict reports by jurors of inappropriate behavior; and (4) post-verdict evidence other than juror testimony. *Tanner,* 483 U.S. at 127, 107 S.Ct. 2739.

such circumstances. *Id.* at —— n.3, 135 S.Ct. at 529 n.3. In my view, this is that exceptional case.

¶ 31 According to the two juror affidavits obtained by Pena–Rodriguez's counsel, Juror H.C. made several statements during jury deliberations indicating that he relied on racial bias to determine Pena–Rodriguez's guilt:

- Pena–Rodriguez "did it because he's Mexican and Mexican men take whatever they want."
- Mexican men are physically controlling of women because they have a sense of entitlement and think they can "do whatever they want" with women.
- Pena–Rodriguez "was guilty because, in [Juror H.C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women."
- Where Juror H.C. used to patrol, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls."
- Pena–Rodriguez's alibi witness was not credible because, among other things, he was "an illegal."

¶ 32 In my view, the circumstances of this case reveal that the safeguards identified in *Tanner* are not always adequate to protect a criminal defendant's constitutional right to an impartial jury. Unlike the comment in *Warger*, Juror H.C.'s multiple statements in this case evince racial bias toward a criminal defendant. And, importantly, these alleged statements reveal Juror H.C.'s inability to decide impartially the crucial issue in this case: whether Pena–Rodriguez committed the charged crimes, or whether he instead had a credible alibi.

¶ 33 The majority claims to adhere to "the unmistakable trend" in United States Supreme Court case law "refusing to deem Rule 606(b) unconstitutional." Maj. op. ¶ 24 n.6. Yet the Supreme Court has expressly acknowledged the possibility that juror bias may be so "extreme" as to call into question the adequacy of the usual safeguards to protect the integrity of the process. *Warger,* —— U.S. at —— n.3, 135 S.Ct. at 529 n.3. In my view, where, as here, it appears that a juror specifically relied on racial bias to find the defendant guilty, Rule 606(b) must yield to a defendant's constitutional right to an impartial jury, in that a trial court must be afforded the discretion to explore the validity of such allegations in the context of a motion for a new trial.

¶ 34 The question whether evidence of a juror's racial bias should be admissible in some cases, notwithstanding Rule 606(b), is hardly uncharted territory. In *Villar,* the United States Court of Appeals for the First Circuit considered whether the usual *Tanner* safeguards suffice to protect a defendant's right to an impartial jury where racial or ethnic bias is alleged, as opposed to the type of juror misconduct at issue in *Tanner.* 586 F.3d at 85–87. In *Villar,* a juror emailed defense counsel following the verdict to report that another juror said, "I guess we're profiling, but [Hispanics] cause all the trouble." *Id.* at 81 (internal quotation marks omitted). Similarly, in *Kittle v. United States,* 65 A.3d 1144, 1147–48 (D.C.2013), a juror wrote to the judge post-verdict alleging that some jurors felt that "all 'blacks' are guilty." Like the present case, both *Villar* and *Kittle* involved racially motivated statements directly tied to the defendant's guilt.

¶ 35 In *Villar,* the First Circuit concluded that "the four protections relied on by the *Tanner* Court do not provide adequate safeguards in the context of racially and ethnically biased comments made during deliberations." 586 F.3d at 87; *see also Kittle,* 65 A.3d at 1154 ("[T]he protections built into the trial process identified by *Tanner* do not adequately protect a defendant's constitutional right to a trial and jury free from racial or ethnic bias."). Although the *Tanner* safeguards serve to protect a defendant's Sixth Amendment right to a jury trial, they focus on juror *misconduct.* *See* 483 U.S. at 127, 107 S.Ct. 2739.[3] In my view, they are

---

3. In *Tanner,* a juror alleged in an interview following the trial that he "felt like ... the jury was on one big party"; that multiple jurors consumed large quantities of alcohol during recesses, smoked marijuana, and ingested cocaine;

not always adequate to uncover racial bias before the jury renders its verdict.

¶ 36 First, as the majority acknowledges, defense attorneys may, for legitimate tactical reasons, choose not to question jurors about racial bias during voir dire and instead attempt to root out prejudice through more generalized questioning. Maj. op. ¶ 18 n.5; *see also Villar,* 586 F.3d at 87 n.5; *Kittle,* 65 A.3d at 1155. And even when defense attorneys are willing to probe this sensitive topic directly, jurors may be reluctant to admit racial bias during voir dire. *Villar,* 586 F.3d at 87. Second, jurors might not report racial comments made during deliberations before the verdict because they are unwilling to confront their fellow jurors, or because they believe they cannot report such comments before rendering a verdict, or because they are unaware that post-verdict testimony is putatively inadmissible. *Kittle,* 65 A.3d at 1155; *see also People v. Pena–Rodriguez,* 2012 COA 193, ¶ 120, 2012 WL 5457362 (Taubman, J., dissenting) (noting that the trial court instructed the jury that it would not be able to communicate with anyone during deliberations). *Contra* maj. op. ¶ 24. Third, observations of the jury by counsel and the court during trial are generally unlikely to uncover racial bias. *Villar,* 586 F.3d at 87; *see* maj. op. ¶ 24. And fourth, non-jurors cannot report racially biased statements made during deliberations to which they obviously do not have access. *Villar,* 586 F.3d at 87. *Contra* maj. op. ¶ 24. For all these reasons, the *Tanner* protections do not always provide adequate safeguards of a defendant's right to an impartial jury.[4]

¶ 37 In my view, the trial court should have discretion in some circumstances to admit evidence of racially biased statements made during juror deliberations. As the *Villar* court noted, the trial judge will often be in the best position to determine whether an inquiry is necessary to vindicate a defendant's Sixth Amendment right to an impartial jury. *See* 586 F.3d at 88; *see also Kittle,* 65 A.3d at 1155–56. Thus, the *Villar* court remanded that case to the trial court to decide whether the juror's report warranted further inquiry. 586 F.3d at 89.[5]

¶ 38 Should the trial court conclude that further inquiry is appropriate, it must then determine whether a juror was actually biased. If such a juror sat on the case, the defendant is entitled to a new trial without having to establish that the juror's bias affected the verdict. *See Commonwealth v. McCowen,* 458 Mass. 461, 939 N.E.2d 735, 765 (Mass.2010) ("Because actual juror bias affects the essential fairness of the trial, a defendant who has established a juror's actual bias is entitled to a new trial without needing to show that the juror's bias affected the jury's verdict."); *cf. People v. Dunoyair,* 660 P.2d 890, 895–96 (Colo.1983) (implying that a defendant is presumptively prejudiced and entitled to a new trial if he or she establishes that a juror was actually biased). Only if the defendant fails to establish that a juror was actually biased must he show that the "statements so infected the deliberative process with racially or ethnically charged language or stereotypes that it prejudiced the defendant's right to have his guilt decided by an impartial jury on the evidence admitted at trial." *McCowen,* 939 N.E.2d at 765. Therefore, contrary to the People's argument, Pena–Rodriguez may be entitled to a new trial regardless of the effect of Juror H.C.'s comments on the verdict.

¶ 39 The majority admits that *Tanner* did not implicate "the exact issue of racial bias" but summarily concludes: "[W]e cannot discern a dividing line between different *types* of juror bias or misconduct." Maj. op. ¶ 23.

and that some jurors fell asleep or were high during trial. 483 U.S. at 115–16, 107 S.Ct. 2739.

**4.** In *Kittle,* the court noted a split among federal courts of appeals on the question whether evidence of racial or ethnic bias should be admissible and concluded that *Villar* was more persuasive than conflicting decisions. *See* 65 A.3d at 1153–54 & n.9 (comparing *Villar,* 586 F.3d at 85–87, *United States v. Henley,* 238 F.3d 1111, 1120 (9th Cir.2001), *and Shillcutt v. Gagnon,* 827 F.2d 1155, 1159 (7th Cir.1987), *with Benally,* 546 F.3d at 1237, *and Williams v. Price,* 343 F.3d 223, 225–35 (3d Cir.2003)).

**5.** On remand, the trial court ultimately determined that the jury's verdict should stand, and that decision was upheld on appeal. *See United States v. Villar,* 411 Fed.Appx. 342, 342 (1st Cir. 2011) (per curiam), *cert. denied,* —— U.S. ——, 131 S.Ct. 2167, 179 L.Ed.2d 947 (2011).

I disagree. I would limit our holding in this case to post-verdict evidence of racial or ethnic bias that goes directly to the issue of the defendant's guilt. Racial bias differs from other forms of bias in that it compromises institutional legitimacy. *See* Ashok Chandran, *Color in the "Black Box": Addressing Racism in Juror Deliberations*, 5 Colum. J. Race & L. 28, 44–45, 47 (2015). A holding limited to such circumstances would reflect and respond to a real-world threat to the integrity of the jury trial right. *See Warger*, —— U.S. at —— n.3, 135 S.Ct. at 529 n.3.

¶ 40 Furthermore, the majority overstates its concerns about the potential demise of the jury system should the allegations in this case be admissible in a motion for a new trial. The majority reasons that "the secrecy of jury deliberations is of paramount importance in our justice system," maj. op. ¶ 22, yet fails to acknowledge that jurors are free to discuss deliberations publicly. *See* Amanda R. Wolin, *What Happens in the Jury Room Stays in the Jury Room ... But Should It?: A Conflict Between the Sixth Amendment and Federal Rule of Evidence 606(b)*, 60 UCLA L.Rev. 262, 294–95 (2012). Concerns about "post-verdict harassment of jurors," maj. op. ¶ 23, are similarly misplaced: Even commentators critical of allowing post-verdict evidence of juror bias have observed that the exception in Rule 606(b)(1) for extraneous information already creates an incentive for the losing party to contact jurors after a verdict has been rendered. *See* Lee Goldman, *Post-Verdict Challenges to Racial Comments Made During Juror Deliberations*, 61 Syracuse L.Rev. 1, 9–10 (2010). The majority's broader fear that the jury system may not survive absent unbending application of Rule 606(b), maj. op. ¶ 22,[6] has proven groundless; the jury system has not collapsed in jurisdictions where trial courts have discretion, in rare circumstances, to allow post-verdict evidence of racial bias. *Cf. Pena–Rodriguez*, ¶ 123 (Taubman, J., dissenting) (observing that post-verdict evidence of racial bias has rarely surfaced in Colorado; thus, any exception to CRE 606(b) would be invoked only infrequently).

¶ 41 The policies of finality and juror privacy that underlie CRE 606(b) are well founded. Moreover, not every stray comment reflecting a racial stereotype warrants a hearing. However, this case presents the extreme exception contemplated in *Warger*. The multiple comments alleged to have been made in this case were heard by other jurors and were directly tied to the determination of the defendant's guilt. According to the two post-verdict affidavits, Juror H.C. expressed in various ways that Pena–Rodriguez "did it because he's Mexican." I simply cannot agree with the majority that "[p]rotecting the secrecy of jury deliberations" is of such "paramount importance in our justice system," maj. op. ¶ 22, that it must trump a defendant's opportunity to vindicate his fundamental constitutional right to an impartial jury untainted by the influence of racial bias. In my view, to foreclose consideration of the allegations presented here is precisely what "shatter[s] public confidence in the fundamental notion of trial by jury." *Id.* Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE EID and JUSTICE HOOD join in this dissent.

2012 COA 158M

---

**6.** The majority quotes *McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), for the proposition that permitting post-verdict evidence of impropriety during deliberations would undermine the jury system. Maj. op. ¶ 22. Yet the Supreme Court recognized in that case that "it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice." *McDonald*, 238 U.S. at 268–69, 35 S.Ct. 783 (internal quotation marks omitted).